1    **WO**

2

3

4

5

6                   **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9    George Russell Kayer,              )
                                        )      No. CV 07-2120-PHX-DGC
10              Petitioner,             )
                                        )      <u>DEATH PENALTY CASE</u>
11   vs.                                )
                                        )      **MEMORANDUM OF DECISION**
12                                      )      **AND ORDER**
                                        )
13   Charles L. Ryan, et al.,[1]        )
                                        )
14              Respondents.            )
     _____)

15

16          Petitioner George Kayer, a state prisoner under sentence of death, has filed an

17   Amended Petition for Writ of Habeas Corpus. Dkt. 35.[2] Petitioner alleges, pursuant to 28

18   U.S.C. § 2254, that he is imprisoned and sentenced in violation of the United States

19   Constitution. He has also filed a motion for evidentiary development. Dkt. 46. For the

20   reasons set forth below, the Court concludes that Petitioner is not entitled to habeas relief or

21   evidentiary development.

22                              **BACKGROUND**

23          In 1997, a jury in Yavapai County convicted Petitioner of first degree murder for

24   taking the life of Delbert L. Haas. The following facts concerning the circumstances of the

25   crime and Petitioner's trial are derived from the opinion of the Arizona Supreme Court

26   _____

27          [1]  Charles L. Ryan, Interim Director of the Arizona Department of Corrections, is
     substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d).

28
            [2]  "Dkt." refers to numbered documents in this Court's electronic case docket.

affirming Petitioner's conviction and sentence, *State v. Kayer*, 194 Ariz. 423, 427-30, 984 P.2d 31, 35-38 (1999), and from this Court's review of the record.

On December 3, 1994, two couples searching for Christmas trees on a dirt road in Yavapai County discovered a body, later identified as that of Delbert L. Haas. Haas had been shot twice, once behind each ear. On December 12, 1994, Yavapai County Detective Danny Martin received a phone call from Las Vegas police officer Larry Ross. Ross told Martin that a woman named Lisa Kester had approached a security guard at the Pioneer Hotel in Laughlin, Nevada, and said that her boyfriend, Petitioner, had killed a man in Arizona. Kester also indicated that a warrant had been issued for Petitioner's arrest in relation to a different crime, a fact Las Vegas police officers later confirmed. Kester gave Las Vegas officers the gun she said was used to kill Haas and led them to credit cards belonging to Haas that were found inside a white van in the hotel parking lot.

During her interaction with the officers, Kester appeared agitated. She told them she had not come forward sooner because she feared Petitioner would kill her, and asked to be placed in the witness protection program. Kester described Petitioner's physical appearance and agreed to accompany an officer to the police station.

Hotel security guards and Las Vegas police officers soon spotted Petitioner leaving the hotel. The officers arrested Petitioner and took him to the police station for questioning. Kester had already been arrested for carrying a concealed weapon. Detectives Martin and Roger Williamson flew to Las Vegas on December 13 to interrogate Kester and Petitioner. Kester gave a complete account of the events that led to Haas's death. Petitioner spoke briefly with the detectives before invoking his right to counsel.

Kester's statements to Detectives Martin and Williamson formed the basis of the State's prosecution of Petitioner. She said Petitioner continually bragged about a gambling system he had devised to beat the Las Vegas casinos, but neither Petitioner nor Kester had money with which to gamble. Petitioner earned some money selling t-shirts, jewelry, and knickknacks at swap meets. His only other income came from using fake identities to bilk

the government of benefits. Petitioner learned that Haas had recently received money from an insurance settlement. He and Kester visited Haas at his house near Cordes Lakes late in November 1994. Kester said that Petitioner convinced Haas to go gambling with them. On November 30, 1994, Petitioner, Kester, and Haas left for Laughlin, Nevada, in Petitioner's van.

The three stayed in the same hotel room in Laughlin. After the first night of gambling, Petitioner claimed to have "won big." Haas agreed to loan Petitioner about $100 of his settlement money so that Petitioner could further utilize his gambling system. Petitioner's system proved unsuccessful and he lost all of the money Haas had given him. Petitioner again told Haas that he had won big, but claimed that someone had stolen his winnings. Kester asked Petitioner what they were going to do now that they were out of money. Petitioner said he was going to rob Haas. When Kester asked how Petitioner was going to get away with robbing someone he knew, Petitioner replied, "I guess I'll just have to kill him."

The three left Laughlin to return to Arizona on December 2, 1994. On the road, all three consumed alcohol, especially Haas. Petitioner and Haas argued over how Petitioner was going to repay Haas. The van made several stops for bathroom breaks and to purchase snacks. At one of these stops, Petitioner took a gun that he stored under the seat of the van and put it in his pants. Petitioner asked Kester if she was "going to be all right with this." Kester said she wanted Petitioner to warn her before he killed Haas.

Petitioner traveled on a series of back roads that he claimed would be a shortcut to Haas's house. Eventually, he stopped the van near Camp Wood Road in Yavapai County. At this stop, Kester said Haas exited the van and began urinating behind it. Kester started to climb out of the van as well, but Petitioner motioned to her with the gun and pushed her back into the vehicle. The van had windows in the rear and on each side through which Kester viewed what occurred next. Petitioner walked quietly up to Haas from behind while he was urinating and shot him behind the ear at point-blank range. He dragged the body off the side of the road to the bushes where it was eventually found, then returned to the car

carrying Haas's wallet, watch, and jewelry.

Petitioner and Kester began to drive away in the van when Petitioner realized that he had forgotten to retrieve Haas's house keys. He turned the van around and returned to the murder scene. Kester and Petitioner both looked for the body. Kester spotted it and then returned to the van. Petitioner returned to the van, too, and asked for the gun, saying that Haas did not appear to be dead. Kester said Petitioner approached Haas's body and that she heard a second shot.

Petitioner and Kester then drove to Haas's home. Petitioner entered the home and removed several guns, a camera, and other items of personal property. He attempted unsuccessfully to find Haas's PIN number in order to access Haas's bank accounts. Petitioner and Kester sold Haas's guns and jewelry at pawn shops and flea markets over the course of the next week, usually under the aliases of David Flynn and Sharon Hughes. They then traveled to Laughlin where Petitioner used the proceeds from selling Haas's property to test his gambling system again and to pay for a room at the Pioneer Hotel. Kester approached the Pioneer Hotel security guard and reported the shooting.

On December 29, 1994, a grand jury indicted Petitioner and Kester on several charges, including premeditated first degree murder and felony first degree murder. In February 1995, the State filed a notice that it would seek the death penalty against both Petitioner and Kester. In September 1995, Kester entered into a plea agreement with the State. In exchange for her truthful testimony, the original charges would be dropped and Kester would be charged with several lesser counts including facilitation to commit first degree murder.

Petitioner was tried in March 1997. His defense centered on the claim that Kester alone had killed Haas and was now framing Petitioner for the murder. The State presented evidence that corroborated Kester's testimony and discredited Petitioner's testimony. The jury convicted Petitioner of all charges, finding him guilty of first degree murder under both premeditated and felony murder theories.

At sentencing, the trial judge, Yavapai County Superior Court Judge William T. Kiger, found two aggravating factors: that Petitioner had previously been convicted of a

serious offense, pursuant to A.R.S. § 13-703(F)(2), and that the murder was committed for pecuniary gain under § 13-703(F)(5). Dkt. 36, Ex. A. Judge Kiger found that Petitioner had failed to establish any statutory mitigating factors and had proved only one nonstatutory mitigator. *Id.* After weighing the aggravating and mitigating factors, the judge sentenced Petitioner to death. *Id.*

The Arizona Supreme Court affirmed the convictions and sentences. *Kayer*, 194 Ariz. 423, 984 P.2d 31. Petitioner filed a petition for postconviction relief ("PCR") with the trial court.[3] PCR Pet., filed 6/6/05. Judge Kiger dismissed a number of claims as precluded and, following an evidentiary hearing on Petitioner's claims of ineffective assistance of counsel, denied the PCR petition. Dkt. 36, Exs. B, C. Petitioner filed a petition for review ("PR"), PR doc. 9, which the Arizona Supreme Court denied.

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA). *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

**PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT**

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair

---

[3] An earlier PCR notice had been vacated when initial PCR counsel failed to file a timely petition (Case No. CR-02-0048-PC). Counsel withdrew, new counsel were appointed, and a new PCR notice was filed (Case No. CR-07-0163-PC).

opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (district court must consider whether the claim could be pursued by any presently available state remedy).

Therefore, in the present case, if there are claims which have not been raised previously in state court, the Court must determine whether Petitioner has state remedies currently available to him pursuant to Rule 32. *See Ortiz*, 149 F.3d at 931 (district court must

consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available, petitioner's claims are "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1.

In addition, if there are claims that were fairly presented in state court but found defaulted on state procedural grounds, such claims also will be found procedurally defaulted in federal court so long as the state procedural bar was independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). It is well established that Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002), and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its procedural default rules such that they are an adequate bar to federal review of a claim. *See Ortiz*, 149 F.3d at 932 (Rule 32.2(a)(3) regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997) (same); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996) (previous version of Arizona's preclusion rules "adequate").

Nonetheless, because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, however, the Court will not review the merits of procedurally defaulted claims unless a petitioner demonstrates legitimate cause for the failure to properly exhaust in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 753. Objective factors which constitute cause include interference by officials that makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *King v. LaMarque*, 455 F.3d 1040, 1045 (9th Cir. 2006).

"Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

**STANDARD FOR HABEAS RELIEF**

For properly exhausted claims, the AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists

of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340; *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. But only the state court's factual findings, not its ultimate decision, are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42.

## DISCUSSION

**PROCEDURAL ANALYSIS**

Petitioner has raised 30 claims. Respondents contend that only five of the claims are properly exhausted. Dkt. 36 at 1. For the reasons set forth below, the Court finds that Claims 1(B)(1), 1(B)(2), 1(B)(3), 1(B)(5), 13-21, 24, and 26 are procedurally barred and will not be considered on the merits. The Court will address procedural issues with respect to the remaining claims as necessary.

**Claim 1**

Petitioner raises five subclaims alleging ineffective assistance of counsel during the guilt and penalty phases of his trial. Dkt. 35 at 20. Respondents concede that subclaim 1(B)(4), alleging ineffective assistance at sentencing, is exhausted, but contend that the remaining subclaims were not exhausted in state court and are procedurally barred. Dkt. 36 at 25-26.

In subclaims 1(B)(1), 1(B)(2), and 1(B)(3), Petitioner alleges, respectively, that he was denied effective assistance of counsel because his attorneys failed to conduct an immediate and thorough investigation; his first lead counsel failed to seek second counsel in a timely manner and second counsel, when appointed, undertook little work on Petitioner's

behalf; and neither of his lead attorneys was qualified to defend a capital case. In subclaim 1(B)(5), Petitioner alleges that he was denied effective assistance of counsel during death qualification of the jury.

In his PCR petition, Petitioner raised two claims of ineffective assistance of counsel, alleging that counsel failed to conduct an adequate mitigation investigation and that counsel performed ineffectively during voir dire. PCR Pet. at 32, 37. In his petition for review to the Arizona Supreme Court, Petitioner included only the claim that counsel's performance was ineffective with respect to mitigation. PR doc. 9. In neither filing did Petitioner raise a claim that his rights were violated by counsel's performance at the guilt stage of trial as alleged in Claims 1(B)(1), 1(B)(2), or 1(B)(3). If Petitioner were to return to state court and attempt to exhaust these claims, the claims would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because they do not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, subclaims 1(B)(1), 1(B)(2), and 1(B)(3) are "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *Coleman,* 501 U.S. at 732, 735 n.1. Petitioner does not attempt to show cause and prejudice or a fundamental miscarriage of justice.

Claim 1(B)(5) is also procedurally defaulted. In Arizona, fair presentation requires that capital petitioners present their allegations not only to the PCR court but also to the Arizona Supreme Court upon denial of relief. *See O'Sullivan,* 526 U.S. at 848; *Swoopes v. Sublett,* 196 F.3d 1008 (9th Cir. 1999) (per curiam) (capital petitioners must seek review in Arizona Supreme Court to exhaust claims). In his petition for review, Petitioner did not include his claim regarding counsel's performance during voir dire. *See* PR doc. 9. Therefore, he did not fairly present the claim to the Arizona Supreme Court. Petitioner may not exhaust the claim now because he does not have an available state court remedy. Petitioner does not assert that cause and prejudice or a fundamental miscarriage of justice excuse the default of these subclaims. Therefore, subclaims 1(B)(1), 1(B)(2),1(B)(3), and 1(B)(5) are denied as procedurally barred.

**Claims 13-21, 26**

Petitioner raised these claims for the first time in his PCR petition. PCR Pet. at 3-9, 40-46. Judge Kiger denied them as "[p]recluded by Rule 32.2(a)(3)." Dkt. 36, Ex. B.

Rule 32.2(a)(3) constitutes a regularly followed and adequate state procedural bar. *See Ortiz*, 149 F.3d at 932. Petitioner nonetheless argues that the PCR ruling "was ambiguous and therefore insufficient to constitute a clear express invocation of a state procedural rule permitting preclusion." Dkt. 40 at 49. According to Petitioner, it is not clear whether the PCR court believed the claims should have been raised on direct appeal or in his prior PCR petition. *Id.* at 45-46. Petitioner cites no authority for the proposition that this alleged ambiguity renders the invocation of Rule 32.2(a)(3) inadequate as a procedural bar, and the Court is unconvinced. There is no ambiguity either in the PCR court's citation to Rule 32.2(a)(3) as the sole basis for finding the claims precluded or in the language of the Rule itself, which states that a claim is precluded if it was waived "at trial, on appeal, or in any previous collateral proceeding." Nothing in the rule requires the state court to specifically identify the proceeding in which the waiver occurred. Moreover, given that the first PCR notice was vacated before a petition was filed, there is no question that the PCR court's ruling referred to Petitioner's failure to raise the claims on direct appeal.

As cause for the default of Claims 13, 14, 16, 17, 19, and 20, Petitioner asserts ineffective assistance of appellate counsel. *See, e.g.*, Dkt. 40 at 39. Ineffective assistance of counsel may constitute cause for failing properly to exhaust claims in state court and excuse procedural default. *Ortiz*, 149 F.3d at 932. To meet the "cause" requirement, however, the ineffective assistance must amount to an independent constitutional violation. *Id.*; *see also Coleman*, 501 U.S. at 755 ("We reiterate that counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation."). As explained below with respect to Claim 22, Petitioner has failed to show that appellate counsel performed at a constitutionally ineffective level. Therefore, he cannot establish cause for the default of the claims. Claims 13-21 and 26 are denied as procedurally barred.

**Claim 24**

Petitioner alleges that the State improperly withheld exculpatory and impeachment evidence in violation of *Brady v. Maryland*. Dkt. 35 at 129. As Respondents note, Petitioner never presented this claim in state court. Dkt. 36 at 89. Because no state remedies remain, the claim is technically exhausted but procedurally defaulted. Petitioner does not allege cause and prejudice or a fundamental miscarriage of justice. Claim 24 is denied as procedurally barred.

**MERITS ANALYSIS**

**Claim 1(B)(4):**

Petitioner alleges that he was denied effective assistance of counsel at sentencing because his attorneys failed to conduct an immediate and thorough mitigation investigation. Dkt. 35 at 45.

<u>Background</u>

*Pretrial, trial, and sentencing*

Petitioner was indicted on December 29, 1994. On January 6, 1995, Linda Williamson was appointed to represent him. RT 1/6/95 at 3.[4] Williamson was under a contract with Yavapai County to represent indigent defendants and had been an attorney for nearly five years with significant experience in criminal law, although she had not tried a capital murder case. RT 3/22/06 at 7-8, 44.

Williamson asked James Bond, an experienced criminal attorney, to serve as second chair, with the intent that he would focus on mitigation and sentencing. RT 3/15/06 at 25, 47; RT 3/22/06 at 45-46. When Bond agreed to serve as second-chair, he understood that the trial would not occur for a long time; his involvement in the case was minimal. RT 3/22/06

---

[4] "RT" refers to the court reporter's transcript. "ROA" refers to the record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case. No. CR-97-0280-AP). "ME" refers to the minute entries of the trial court. Certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on May 12, 2009. Dkt. 50.

at 48. Although Williamson never focused on the sentencing phase of trial, she spoke with Petitioner about mitigation in a general way. RT 3/22/06 at 32.

Williamson filed a number of pretrial motions, including one requesting a Rule 11 pre-screening psychiatric examination of Petitioner. *Id*. at 50; ROA 30. The court appointed Dr. Daniel Barack Wasserman to conduct the examination. *Id*. at 53-54. Dr. Wasserman concluded that Petitioner did not suffer from an identifiable mental illness or defect, although some test results were suggestive of a "paranoid or depressive disorder." PCR pet., Ex. 6. Based on Dr. Wasserman's evaluation, the trial court found Petitioner competent to stand trial and no further evaluations took place. RT 3/22/06 at 57.

After investigating leads and interviewing witnesses, Williamson concluded that the case would be difficult to win. RT 3/22/06 at 46; RT 3/16/06 at 98. She believed that delay was her best option, hoping that Kester, the State's key witness, who was pregnant with Petitioner's child, would begin using drugs again, abscond, or otherwise become unavailable to testify. RT 3/22/06 at 47-48.

In June 1996, Petitioner sought to remove Williamson and replace her with Bond as lead counsel. The State wanted the case to proceed to trial, the trial court wanted to schedule a firm July trial date, and Bond was adamant that he could not be appointed lead counsel due to his heavy case load. RT 6/19/96 at 1-20; RT 3/30/06 at 122. Two days later, after further discussion, the court allowed Williamson to withdraw, directed Bond to remain as second-chair, and appointed David Stoller, the next contract attorney in line for capital cases, as lead counsel. RT 6/21/96 at 9.

At the time of his appointment, Stoller had been practicing criminal law for nearly 30 years, both as a prosecutor and a defense attorney. RT 3/15/06 at 57-60. As a prosecutor, he had taken 50 felony cases to jury trial, including one capital case. *Id*. at 58.

In August, the trial court allowed Bond to withdraw. RT 8/20/96 at 3. Petitioner subsequently requested that Marc Victor be appointed to replace Bond. RT 3/ 15/06 at 90; RT 3/16/06 at 38. Victor had represented Petitioner on another criminal matter. *Id*. He was appointed as second counsel. At the time, he had about two years of experience as a lawyer.

In January 1997, defense counsel filed a number of motions, including an *ex parte* application for funds to further investigate the crime and to conduct a mitigation investigation. ROA 107A. At the time of Petitioner's trial, requests for certain defense expenses were required to be made to the Yavapai County presiding judge. *See* RT 3/15/06 at 113. Judge Weaver, the presiding judge, granted additional funds for the crime investigation but deferred ruling on the request for funds relating to mitigation. ME 2/24/97; RT 2/24/97 at 3-8. Judge Weaver stated that he would wait to see if there was a conviction before he would authorize funds for a mitigation investigation. RT 3/15/06 at 115.

The trial began on March 5, 1997. The jury returned its verdict on March 26. The court scheduled the aggravation/mitigation hearing for May 27, with a sentencing date of June 17, 1997. ME 3/26/97.

On April 8, 1997, at Stoller's request, Judge Weaver authorized $6,000 for mitigation specialist Mary Durand to begin an investigation. ME 4/8/97. The order provided that the amount was not to be exceeded without prior authorization. *Id*. Counsel subsequently argued that Durand needed additional time to conduct her mitigation investigation; the court continued the aggravation/mitigation hearing to June 24, and set sentencing for July 15, 1997. RT 5/16/97 at 13-14.

The court held a status conference on June 6. Defense counsel Victor informed the court that Durand had met twice with Petitioner, but that she needed an additional three to six months to complete her investigation. RT 6/6/97 at 10. Victor also told the court that Petitioner objected to such a continuance, explaining that Petitioner "understands exactly what is going on. He understands the nature of putting the mitigation case on. He understands that that would be to some extent compromised, if myself and Mr. Stoller are not able to push back the date." *Id.* at 11. Next, lead counsel Stoller, who wanted to make a "good record" of the issue, *id.* at 14, indicated that Petitioner understood Durand's position that potentially significant areas of mitigation needed to be explored.[5] *Id.* at 12. Petitioner,

---

[5] Stoller appeared at the hearing telephonically. *See* RT 6/6/97 at 8.

however, "simply didn't want to wait in the county jail and have that kind of diet and not have access to things to read and television, and things of that nature." *Id.* Based in part upon this "life-style choice," and against Stoller's "best advice" and "strong recommendation," *id.* at 13, Petitioner had informed counsel that he would not waive time to allow Durand to complete her investigation. *Id.* at 12.

The court next addressed Petitioner directly. Petitioner detailed his reasoning as follows:

> In speaking with Mary Durand, I had no idea what a mitigation specialist was before I sat down and talked to her. Didn't know what they looked for, didn't know what she was looking for in this case with me or with my life. We talked as has been indicated on two separate occasions for several hours. There isn't any major areas of investigation that are open or available to her that her and I have discussed [sic].
>
> These areas that Mr. Stoller brings out that he is calling substantial evidence, from what I understand in my conversation with Mary Durand, she is talking about a fetal alcohol syndrome that possibly existed. She hasn't had the opportunity to investigate it, and some minor areas and details in my life that I personally can't see how they would relate to mitigation in this case.
>
> So it's with reservations when Mr. Stoller talks about vital areas and evidence that can be used in mitigation. It's a personal difference, and certainly of opinion [sic]. I'm saying I don't see anything here of substantial value. Obviously, Mr. Stoller is saying that he does.

*Id.* at 15-16. Petitioner also explained that Durand had told him that she would testify at the aggravation/mitigation hearing and do her best even if she was unable to complete her investigation. *Id.* at 16. Petitioner then continued to detail his rationale for objecting to a further continuance:

> I don't think that – I don't think that some people understand exactly where I'm at. It certainly hasn't been presented here, and I don't want to turn this into a mitigation hearing, but I feel that there's a few things that need to be said today in view of where we're at.
>
> One of them is that I don't have a death wish. I'm not trying to manipulate the Court to such a position that they have no alternative but to decide to give me the death penalty. I don't feel the lack of Mary Durand's mitigation is going to be a major factor in the decision.

*Id.* at 17.

Judge Kiger, explaining that he would look favorably on a request for an additional

30 days "or something like that," though not a continuance of 90 or 180 days, directly asked Petitioner if he wished to continue the June 24 aggravation/mitigation hearing. *Id.* at 20-21. Petitioner responded that he understood the court's position but was "not in favor of any more continuances." *Id.* at 21. Petitioner explained, "Believe me, if I thought that – that Miss Durand had valid evidence that should be presented to this Court, I'd be scratching and clawing and asking for 180 days." *Id.*

Citing Petitioner's waiver of a continuance and its effect on their ability to represent him, counsel moved to withdraw. *Id.* at 25. The court denied the motion. *Id.* at 25-26. At the end of the hearing, at defense counsel's request, the court rescheduled the aggravation/mitigation hearing for July 8 while maintaining the sentencing date of July 15. *Id.* at 30.

Counsel filed a sentencing memorandum on Petitioner's behalf. ROA 166. In arguing against a death sentence, counsel offered one statutory mitigating factor and several nonstatutory circumstances: intoxication causing an inability to appreciate the wrongfulness of one's conduct under A.R.S. § 13-703(G)(1); intoxication not rising to the level of the (G)(1) factor; Petitioner's military record; the disparity in sentences between Petitioner and Kester; Petitioner's poor physical health; his intelligence and ability to contribute to society; and his devotion to his mentally disabled son. *Id.* at 12-17.

At the July 8 aggravating/mitigation hearing, defense counsel called four witnesses: a corrections officer who testified briefly about Petitioner's non-disruptive conduct and his work with other inmates in the law library; Petitioner's mother and sister; and Mary Durand. Petitioner and his son also made statements to the court.

Sherry Rottau, Petitioner's mother, testified that his father, an aeronautical engineer, died when Petitioner was in kindergarten. RT 7/8/97 at 12. Rottau remarried when Petitioner was in high school. *Id.* at 13. When Petitioner was 15 the family relocated to Arkansas for a year before moving back to California where he graduated from high school. *Id.* at 14. In school Petitioner earned Bs and Cs and some As. *Id.* at 15. He was an "ambitious" child who earned money by mowing lawns and shining shoes. *Id.* at 16. Rottau

testified that Petitioner was sick a lot as a child with colds, the flu, and earaches; he was also hyperactive and had trouble sleeping. *Id.* at 16-17.

After high school Petitioner joined the Navy and got married. *Id.* at 21. He began exhibiting manic depressive behavior following his military service. *Id.* at 22-23. He would work for 24 hours straight and then sleep for a long period of time; he would start projects only to abandon them and become depressed. *Id.* Rottau was concerned about these cycles of happiness and depression. *Id.* at 24.

Rottau also testified that Petitioner had a history of heart problems. *Id.* at 25-26. Finally, she testified about the close relationship between Petitioner and his son, Tayo. *Id.* at 29-31.

Jean Hopson, Petitioner's older sister, testified that his father had drinking and gambling problems and that Petitioner suffered difficulties in those areas as well. *Id.* at 34-37. Hopson described Petitioner's mental state as consisting of highs and lows and testified that he had been diagnosed as bipolar, had experienced a nervous breakdown, and been treated with lithium. *Id.* at 36, 38, 41-43. She also described a loving relationship between Petitioner and Tayo. *Id.* at 40.

Mary Durand testified about the role of a mitigation specialist, which is to develop a social history of the defendant "in order to determine family dynamics, . . . mental, medical, emotional, familial, nutritional, and social factors, and behaviors that the defendant has been involved in and exposed to throughout the course of his life." *Id.* at 46-47. Durand explained that a mitigation specialist investigates "social and educational, medical, marital, sexual, any kind of issue that presents itself that gives us an idea of who the client is that we're dealing with, specifically to look at impairment." *Id.* at 47. She testified that the average number of hours needed to complete a mitigation investigation is "ideally" between 2,500 and 5,000, but as a practical matter "between 1,000 and 1,500 hours . . . begins to approach a competent test and reliability." *Id.* at 50. According to Durand, a mitigation specialist must "attempt to get every piece of information you can," including medical and mental health records, military records, school records, and court documents. *Id.* at 49, 51.

Durand testified that she met with Petitioner twice for a total of six or seven hours. *Id.* at 52. She also met with his mother twice, his sister once, his uncle twice, and his son once. *Id.* at 53. She reviewed the presentence reports from Petitioner's criminal cases. *Id.* Durand did not obtain any of Petitioner's psychiatric, medical, school, or military records because Petitioner was "not interested in having the world know about his life."[6] *Id.* at 54. Concerning Petitioner's reluctance to allow a full-scale mitigation investigation, Durand explained:

> We talked for an extraordinarily long period of time, just about the issue of allowing me the time I needed to do an appropriate, complete and reliable mitigation on his behalf. He had very, very strong feelings where – the fact that he had been in jail two years and . . . five months at that time, and was not willing to wait another year.
>
> I was very direct with him, and I told him I couldn't do it in three weeks or six weeks or eight weeks, or three months, and he is very concerned about his emotional health, his physical health, and catching a new case, if you will, being in this particular environment for that period of time.
>
> He was very concerned about putting his family through any emotional, public hearing. He was concerned about his son. His mother is 76 and not in good health and has serious memory lapses, and he was concerned that he would add to her already fragile medical state, and he just didn't want to put anybody through this process. He felt like they've been through enough, and he didn't want to add to that.

*Id.* at 56-57.

Durand then testified that if Petitioner had been willing to allow additional time she would have investigated several areas of potential mitigation, foremost among them the issue of Petitioner's mental health. *Id.* at 59. Durand stated that "there's definitely very serious indications of serious psychiatric difficulties," including a diagnosis of bipolar disorder and an incident in which he was hospitalized with "suicide ideation." *Id.* at 59-60. Durand also testified, citing reports of alcohol abuse in Petitioner's family background, that she would have investigated the issue of alcoholism and poly-substance abuse. *Id.* at 60. Finally, she would have further investigated Petitioner's physical health based on reports that his mother

---

[6] Petitioner did sign a waiver for the release of his military records, but at the time of the hearing Durand had not yet received them. RT 7/8/97 at 56.

experienced a difficult pregnancy and labor and that Petitioner was a sickly child. *Id.* at 61-62. Durand indicated that Petitioner's "educational record does appear to be good in that there are areas in which he clearly is quite brilliant and very, very well-spoken." *Id*. at 62.

Durand reiterated that Petitioner did "not want to talk about" the proposed areas of mitigation. *Id.* at 62. She concluded that, in addition to Petitioner's unwillingness to spend additional time in the county jail and his reluctance to expose his mother and son to further legal proceedings, he did not wish to pursue a mitigation investigation due to his "pride," "dignity," and desire not to "relive" his past. *Id*. at 63.

At the conclusion of the aggravation/mitigation hearing, after listening to Durand's testimony, the trial court engaged in the following colloquy with Petitioner:

> Court: Change your mind about what you told me last time as far as go ahead with sentencing on the 15th of July? Do you want more time? By asking you the question, I'm basically saying if you tell me right now that you've considered it, and you want more time, I'm prepared to give you more time.
>
> But I think you're an intelligent individual. You know what she's just testified to. I believe strongly that an individual ought to have the ability to make some decisions on their own, if they have gotten all the information and have the requisite intelligence.
>
> You got the information, you got the intelligence, you've talked to your counsel, you've heard Ms. Durand. Your call.
>
> Petitioner: I appreciate your patience and your concern in this, and I have not changed my feeling. Thank you.

*Id*. at 71.

In addition to the testimony from the aggravation/mitigation hearing, Judge Kiger, in sentencing Petitioner, reviewed information contained in the presentence report. PCR Pet., Ex. 26. The report discussed Petitioner's mental health, describing an incident when "he became extremely depressed, had near suicide attempts [and] in September of 1989, he had been diagnosed as Manic Depressive at the Phoenix VA Hospital"; it further indicated that Petitioner had been prescribed lithium. *Id.* at 7. The report also noted Petitioner's substance abuse history, including the fact that he was a "heavy abuser of alcohol." *Id.*

The trial court also reviewed, along with Dr. Wasserman's Rule 11 report, the results

of a mental status examination prepared in 1990 by Dr. Jeffrey Penney, a psychiatrist from Prescott. RT 7/15/98 at 38; *see* Dkt. 52, Attach. Dr. Penney reported that Petitioner described experiencing symptoms of mania and depression with "intermittent suicidal ideation"; Petitioner indicated that he was presently taking lithium and an anti-depressant. Dkt. 52, Attach. at 1. Dr. Penney noted that drug and alcohol use were often associated with the manic episodes described by Petitioner. *Id.* Petitioner reported a "history of heavy alcohol usage throughout his life" and informed Dr. Penney that he currently drank "3 six-packs a week" and would drink more if he could afford to do so. *Id.* Dr. Penney observed that Petitioner experienced "notable" gaps in his memory and that his "[i]nsight seemed mildly impaired and judgment impaired based on his continued alcohol abuse with depression and with symptoms consistent with some alcohol-induced memory dysfunction." *Id.* at 2. Dr. Penney also reported that Petitioner carried a cyanide pill with him at all times, including during the evaluation, in the event he wanted to commit suicide. *Id.* Dr. Penney diagnosed Petitioner with amphetamine, marijuana, and alcohol abuse, as well as depression probably secondary to alcohol intake. *Id.* at 3. Because Petitioner would not authorize the release of his medical records, Dr. Penny reached a "rule out"diagnosis of Bipolar Affective Disorder. *Id.*

At the sentencing hearing on July 15, the court engaged in another colloquy with Petitioner, explaining that "if you told me you wanted more time, as your attorneys were requesting, as Miss Durand had requested, to find additional information and evidence to present to me, . . . I would certainly grant it." RT 7/15/97 at 3. Judge Kiger next outlined the applicable provisions of the death penalty statute and indicated that he was prepared to find two aggravating circumstances. *Id.* at 4. The court then asked Petitioner if, with that information in mind, he wished to proceed with sentencing. *Id.* at 5. While Petitioner consulted with counsel, the court elaborated:

> This is a very, very important decision, and I want Mr. Kayer to make it based upon discussion with counsel and reflection, and I want him to have as much information as possible. I hope he understands what I have just reviewed with him, and if there is any question about that, I'd be happy to

respond.

>    Before I officially get into the sentencing of this matter, if that's – I will tell you this, if Mr. Kayer, after review, still wants to go ahead with sentencing today, I'm ready to proceed. On the other hand, if Mr. Kayer believes that he needs to ask for additional time, I am willing to do it that way.

*Id.* at 6.

The court took a recess to allow further consultation. *Id.* at 6. After the recess Petitioner indicated that he understood the information provided by the court, but that he wished to proceed with sentencing. *Id.* at 6-7.

In his special verdict, Judge Kiger found that "the intentional and knowing decisions and actions of the defendant have blocked the attempts by his trial counsels [sic] to fully pursue mitigation pursuant to 13-703(G)(1) and the court is unable to find that any such factor has been proven by a preponderance of the evidence." Dkt. 36, Ex. A at 2. The court found that no statutory mitigating circumstances existed. *Id.* at 2-3. The court then "considered" Petitioner's proffered nonstatutory mitigating circumstances, finding that Petitioner had proved that he was "an important figure in the life of his son." *Id.* at 3. The court found that the remaining nonstatutory circumstances had not been proved, explaining, in relevant part:

>    2.   The defendant was apparently diagnosed and treated for a time for a mental condition referred to as a bipolar or manic/depressive problem. The court can speculate as to a possible relationship between such a condition and the murder; the court cannot find a relationship by a preponderance of the evidence.
>
>         . . . .
>
>    4.   The defendant has apparently had some level of addiction to both gambling and alcohol. There is no dispute that the defendant consumed several beers on the trip from Laughlin to the place where the murder took place. As with #2 above, there may be some possible connection between such a condition and the murder such that it effected [sic] the defendant's ability or capacity to conform his conduct with the requirements of the law. It would be at best speculation by the court and is not found by a preponderance of the evidence.
>
>    5.   The Rule 11 evaluation conducted by Dr. Wasserman in 1995 found some unusual results in the MMPI and some possible problems with

paranoia. As with #2 above, there may be some possible connection between such a condition and the murder such that it effected [sic] the defendant's ability or capacity to conform his conduct with the requirements of the law. It would be at best speculation by the court and is not found by a preponderance of the evidence.

6. There have been references to the defendant having suicide thoughts. Apparently at one time, the defendant carried a cyanide pill to the office of a doctor who was performing a mental health evaluation. His explanation was that he would use the pill if he decided it was needed. The court has considered the possibility that the defendant has determined to block the attempts by his attorneys to present mitigation as a way of now bringing about his death. This too is speculation by the court and does not rise to the point of proof by a preponderance of the evidence.

*Id.* at 3-4.

Judge Kiger concluded that "[s]ince these factors have not been proven, the court cannot find these factors applicable to the sentencing structure called for in 13-703. These factors as considered have essentially no weight to balance against the aggravating factors." *Id.* at 5.

On appeal, the Arizona Supreme Court agreed with the trial court's assessment of the mitigating evidence:

Defendant's alleged mental impairment on the day he murdered Haas, whether attributed to historical substance abuse or a mental disorder, also must be considered as a nonstatutory mitigating circumstance.

. . . .

But the record shows that the existence of impairment, from any source, is at best speculative. Further, in addition to offering equivocal evidence of mental impairment, defendant offered no evidence to show the requisite causal nexus that mental impairment affected his judgment or his actions at the time of the murder. Thus, we conclude that the trial court ruled correctly that impairment was not established as a nonstatutory mitigating factor by a preponderance of the evidence.

*Kayer*, 194 Ariz. at 438, 984 P.2d at 46 (citations omitted).

*Postconviction proceedings*

In March 2006, Judge Kiger held an evidentiary hearing on Petitioner's ineffective assistance claims. The hearing lasted nine days. Petitioner called 17 witnesses, including each of the attorneys who had represented him at trial, along with Ms. Durand and his current

- 23 -

mitigation specialist. He also presented expert testimony from a clinical neuropsychologist, a forensic psychiatrist, and a physician specializing in addiction medicine. Finally, several family members and a friend testified about Petitioner's family background, problems with alcohol abuse and gambling, and mental health issues.[7]

Lead counsel Stoller testified that the defense plan was to obtain mitigating information and present a full mitigation case, including mental health evidence, through Durand's investigation; she would gather the information and submit it to the appropriate experts. RT 3/15/06 at 148-49. Petitioner, however, did not want the continuance necessary to allow such an investigation, nor did he want to explore issues concerning his metal health because, as Durand informed Stoller, "he felt they would cause him to be viewed as weak and vacillating in prison." RT 3/16/06 at 76. Petitioner also "thought it wouldn't make any difference." *Id.* at 100. In addition, he believed that his "living conditions" would improve in prison because he would have "smoking and television privileges." *Id.* at 103. Thus, Stoller testified, the defense team was prevented from developing more mitigation by Petitioner's waiver of a continuance. *Id.* at 78. Nevertheless, Stoller went to Phoenix to visit Petitioner's mother, son, and sister, and later had contact with other family members. *Id*. at 91, 99. He asked Petitioner's mother for a history of Petitioner's life. *Id*. at 165. Later, Stoller discussed mitigation with Petitioner's mother and explained that "bad is good" for purposes of mitigation. *Id*. at 173-74.

Second-chair Victor testified that he and Stoller had intended to pursue Petitioner's mental health as mitigating evidence. RT 3/22/06 at 49. Victor tried to "disabuse" Petitioner of the notion that to pursue mitigation was tantamount to admitting guilt. *Id.* at 59-60. Victor testified that he spoke in "great detail" with Petitioner until he was assured that

---

[7] In addition, Larry Hammond, a local attorney with capital case experience, testified as an expert on the *Strickland* standard. In his opinion, Petitioner's trial counsel performed at a constitutionally ineffective level. *See, e.g.*, RT 3/23/06 at 27, 93, 96-97; PCR Pet., Ex. 32.

Petitioner understood the nature and purpose of mitigation evidence. *Id* at 79. Petitioner explained to Victor why he did not wish to delay sentencing in order to pursue mitigation: first, he was very close to his mother and son and thus "he was very adverse [sic] to having things about his past . . . brought out in front of them, and so he was very adverse [sic] to having them exposed to that information and he was not willing to cooperate with mitigation." *Id.* at 88. Petitioner also cited the fact that he had been in the county jail for an extended period and he looked forward to the benefits of prison, primarily television and smoking privileges; he "perceived that whatever time he had to spend in the Department of Corrections would be more pleasurable than the time he had been spending in the Yavapai County Jail." *Id.* Victor argued "as persuasively as I could, on many occasions" to convince Petitioner to allow an investigation. *Id.* at 90. He was also hopeful that Durand would be able to change Petitioner's mind by outlining the scope of a full mitigation investigation and explaining that in his case persuasive mitigation information existed. *Id.* at 91. Victor adamantly opposed Petitioner's decision to waive a continuance, but "believe[d] Mr. Kayer understood things and had a rational position and didn't want to put his family through mitigation." *Id.* at 92.

Mary Durand testified that Petitioner was motivated to waive a continuance based on fear for his emotional and physical well being in the county jail. According to Durand, he "wanted desperately to get out." RT 3/29/06 at 72, 73. Nevertheless, despite his reluctance to pursue mitigation, Petitioner provided contact information for family members and executed some releases for documentary evidence. *Id.* at 76. Durand explained the purpose of mitigation to Petitioner, who became upset that counsel had waited so long to begin an investigation. *Id.* at 79-80. Notwithstanding their conversations, Durand felt Petitioner had only a "minimal understanding of [the] scope and breadth and depth of mitigation." *Id.* at 122.

Keith Rohman, Petitioner's post-conviction mitigation specialist, testified that a mitigation investigation should begin immediately, in part because it is necessary to "educate the client" and overcome his initial reluctance to present mitigating evidence. Rohman

testified that Petitioner's decision not to "cooperate with the mitigation investigation" was based on several factors: "he did not have a clear understanding of mitigation," about which his lawyers had failed to educate him; "he was very concerned about the situation at the Yavapai Jail"; "he was frustrated with his attorneys for having waited so long"; he believed that the presentation of mitigation was an admission of guilt; and he thought that offering mitigating evidence would be futile. *Id.* at 61-64. Rohman testified that there were four areas of mitigation that trial counsel omitted or left insufficiently developed: Petitioner's bipolar disorder, alcoholism, pathological gambling, and his transient living situation as a child. *Id.* at 68-78. Rohman then outlined his findings with respect to each of these areas. *Id.* Finally, Rohman testified about the violent, overcrowded conditions of the Yavapai County Jail. *Id.* at 81-88. He also noted that the jail failed to provide Petitioner with the special diet recommended for his heart condition. *Id.* at 89.

Petitioner presented testimony from a number of experts. Dr. Anne Marie Herring, a clinical neuropsychologist, testified that Petitioner had an average IQ (102) and that, with one exception, the results of the tests she administered were normal. RT 3/17/06 at 29; *see* PCR Pet., Ex. 39. The exception was one of the card sorting tests, designed to measure complex problem solving abilities, on which Petitioner achieved a low-average or borderline score. *Id.* at 37-38. This result was indicative of a cognitive deficit. *Id* at 38. According to Dr. Herring, such a deficit would be consistent with various etiologies, including chronic heavy substance abuse, bipolar disorder, and traumatic brain injury. *Id.*

Dr. Barry Morenz, a forensic psychiatrist, diagnosed Petitioner with the following conditions: bipolar type 1, hypomanic; alcohol dependence; personality disorder with schizotypal, narcissistic, and antisocial features; and, citing Dr. Herring's test results, cognitive disorder not otherwise specified. RT 3/17/06 at 94-95; *see* PCR Pet., Ex. 33. Dr. Morenz testified that Petitioner's cognitive disorder interfered with his capacity to address his other conditions, impairing his ability to recover from his alcohol and gambling addictions. *Id.* at 105. At the time of the murder, according to Dr. Morenz, all of these conditions were manifesting themselves and combined to make Petitioner "very, very

impaired." *Id.* at 107.

Dr. Morenz further testified that Petitioner was enjoying his life in prison, where he had completed and published one book and was working on two others. *Id.* at 109-110. He enjoyed receiving fan mail for his writing. *Id.* His laundry and trash were picked up and his meals were provided. *Id.* Dr. Morenz characterized Petitioner's positive state of mind as unrealistic and a function of his hypomania. *Id.*

Dr. Michel Sucher, a physician specializing in addiction medicine, diagnosed Petitioner with alcohol dependence, polysubstance abuse, and pathological gambling. RT 3/30/06 at 16; *see* PCR Pet., Ex. 34.

Several lay witnesses testified, including Petitioner's sister, two cousins, an aunt, and a friend. Their testimony indicated that several of Petitioner's relatives also suffered from mental health issues, including manic and depressive episodes. According to this testimony, Petitioner's maternal cousin was institutionalized in a psychiatric facility, where she was initially diagnosed with schizophrenia and later with manic depressive disorder. RT 3/24/06 at 63. Her mother had also experienced severe mood swings. *Id.* at 68. Petitioner's maternal aunt had a history of hearing voices, as did her grandfather and sister. RT 3/31/06 at 6-7. Petitioner's other maternal aunt suffered from depression. *Id.*

The testimony of these witnesses further indicated that Petitioner had longstanding issues with substance abuse and gambling, as did other family members. *See, e.g.*, RT 3/24/06 at 66; RT 3/31/06 at 41. Pete Decell, a friend and coworker with whom Petitioner had committed a series of residential burglaries, testified that Petitioner had been a heavy drinker. RT 3/29/06 at 50. He also stated that Petitioner did not like to work and had gotten a "rush" from committing the burglaries. *Id.* at 32.

Judge Kiger, presiding over the PCR proceedings, rejected Petitioner's claim of ineffective assistance of counsel at sentencing. Judge Kiger determined "at the time of sentencing, the defendant voluntarily prohibited his attorneys from further pursuing and presenting any possible mitigating evidence." Dkt. 36, Ex. C at 2. He ruled that Petitioner had failed to demonstrate deficient performance, explaining that "trial counsel did not fall

below the *Strickland* standard for effective representation concerning potential mitigation." *Id.* at 1. This finding was based on the judge's "own observations of the defendant during trial and the sentencing phase" and the Arizona Supreme Court's determination that Petitioner was competent when he waived a further mitigation investigation and that the waiver was knowing and voluntary. *Id.* at 2.

Judge Kiger also found that Petitioner had not shown that he was prejudiced by counsel's performance:

> This court further concludes that if there had been a finding that the performance prong of the *Strickland* standard had been met, that no prejudice to the defendant can be found. In stating this conclusion the court has considered the assertion of mental illness, jail conditions, childhood development, and any alcohol or gambling addictions.

*Id.* at 2.

Analysis

Petitioner contends that the PCR court's rejection of this claim constituted an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts. Dkt. 37 at 46-47. The Court does not agree.

The clearly established federal law governing claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88.

In assessing whether counsel's performance was deficient under *Strickland*, the test is whether counsel's actions were objectively reasonable at the time of the decision. *Id.* at 689-90. A petitioner must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. The question is "not whether another lawyer, with the benefit of hindsight, would have acted differently, but 'whether counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998) (quoting *Strickland*, 466 U.S. at 687).

While trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. In making this assessment, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted). The Supreme Court has instructed that "[i]n judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made" and by applying deference to counsel's judgments. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In *Wiggins*, 539 U.S. at 534, the Court noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." The totality of the available evidence includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard

applies to *Strickland* claims under AEDPA). Therefore, to prevail on this claim, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an objectively unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

In reviewing Petitioner's allegations of ineffective assistance, this Court further notes that the judge who presided over Petitioner's trial and sentencing also presided over the PCR proceedings. Thus, in considering Petitioner's ineffective assistance claims, Judge Kiger was already familiar with the record and the evidence presented at trial and sentencing. This familiarity with the record provides the Court an additional reason to extend deference to the state court's ruling. *See Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998). As the Ninth Circuit explained in *Smith*, when the judge who presided at the post-conviction proceeding is the same as the trial and sentencing judge, the court is considerably less inclined to order relief because doing so "might at least approach 'a looking-glass exercise in folly.'" *Id.* (quoting *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)).

Finally, because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." 466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").

Petitioner is not entitled to relief because Judge Kiger did not apply *Strickland*'s second prong in an unreasonable manner when he determined that Petitioner failed to prove that he was prejudiced by counsel's performance.[8] First, under *Schriro v. Landrigan*, 550 U.S. 465, Petitioner cannot show prejudice because he waived an extension of the sentencing date and thereby waived presentation of the full-scale mitigation case that defense counsel

---

[8] Because this claim is more readily resolved on the basis of lack of prejudice, *see Strickland*, 466 U.S. at 697, the Court makes no finding regarding the alleged deficiency of trial counsel's performance at sentencing.

and mitigation specialist Durand had intended to develop and present. Next, Petitioner cannot show prejudice because the evidence produced during the PCR proceedings, which was the product of an exhaustive mitigation investigation, was largely cumulative of the evidence presented at sentencing and fell short of the type of mitigation information that would have influenced the sentencing decision. *See id.* at 481. Finally, the reasonableness of the PCR court's rejection of this claim is buttressed by the fact that Judge Kiger had presided over Petitioner's trial and sentencing and was therefore "ideally situated," *Landrigan*, 550 U.S. at 476, to gauge the validity of Petitioner's waiver and to weigh the totality of the mitigating evidence against the evidence presented at sentencing. *See Gerlaugh*, 129 F.3d at 1036.

In *Landrigan*, the petitioner refused to allow defense counsel to present the testimony of his ex-wife and birth mother as mitigating evidence. He also interrupted as counsel tried to proffer other evidence and told the Arizona trial judge that he did not wish to present any mitigating evidence and to bring on the death penalty. The court sentenced him to death and the sentence was affirmed on direct appeal. *State v. Landrigan*, 176 Ariz. 1, 859 P.2d 111 (1993). The PCR court rejected Landrigan's request for a hearing and denied his claim that counsel was ineffective for failing to conduct further investigation into mitigating circumstances, finding that he had instructed counsel at sentencing not to present any mitigating evidence at all. Landrigan then filed a federal habeas petition. The district court denied the petition and refused to grant an evidentiary hearing because Landrigan could not make out a colorable claim of ineffective assistance of counsel. A panel of the Ninth Circuit affirmed the denial. *Landrigan v. Stewart*, 272 F.3d 1221 (9th Cir. 2001). The en banc Ninth Circuit reversed, holding that counsel's performance at sentencing was ineffective. 441 F.3d 638 (9th Cir. 2006). According to the court, Landrigan's "last-minute decision could not excuse counsel's failure to conduct an adequate investigation prior to sentencing." *Id.* at 647. The court then reiterated its view "that a lawyer's duty to investigate [mitigating circumstances] is virtually absolute, regardless of a client's expressed wishes." *Id.*

The Supreme Court reversed. *Schriro v. Landrigan*, 550 U.S. 465. The Court held

that the district court did not abuse its discretion in failing to hold an evidentiary hearing on Landrigan's claim of sentencing-stage ineffectiveness and that the court was within its discretion in denying the claim based on Landrigan's unwillingness to present mitigation evidence.

*Landrigan* compels the conclusion that Petitioner is not entitled to habeas relief. *Landrigan* establishes the standard for evaluating a sentencing-stage ineffective assistance claim brought by a petitioner who directed counsel not to pursue a case in mitigation. "If [the petitioner] issued such an instruction, counsel's failure to investigate further could not have been prejudicial under *Strickland*." *Id.* at 475; *see Owen v. Guida,* 549 F.3d 399, 406 (6th Cir. 2008) ("a client who interferes with her attorney's attempts to present mitigating evidence cannot then claim prejudice based on the attorney's failure to present that evidence"); *see also Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007) ("Neither the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence."); *Lovitt v. True*, 403 F.3d 171, 179 (4th Cir. 2005) ("Lovitt is correct to insist that a client's decision in this regard should be an informed one. At the same time, Lovitt's lawyers were hardly ineffective for incorporating their client's wishes into their professional judgment."); *Rutherford v. Crosby*, 385 F.3d 1300, 1313-14 (11th Cir. 2004) ("[U]nder *Strickland* the duty is to investigate to a reasonable extent . . . and that duty does not include a requirement to disregard a mentally competent client's sincere and specific instructions about an area of defense and to obtain a court order in defiance of his wishes."); *Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993) ("[C]ounsel for Jeffries had been prepared to present evidence in mitigation and had discussed with Jeffries the ramifications of failing to present the evidence. Accordingly, counsel did not deprive Jeffries of effective assistance in acquiescing in the latter's considered decision.").

In Petitioner's case, prior to his conviction, counsel performed only a limited investigation into mitigating evidence. When funding for a mitigation specialist was authorized, Mary Durand began a full-scale investigation. Counsel planned to use the information she gathered to retain further experts, including mental health professionals.

While Durand's investigation was still in its early stages, Petitioner indicated that he did not wish to delay the sentencing date. His waiver of a continuance – a continuance the trial court was prepared to grant – was based on several factors, including an unwillingness to involve his family in an investigation into his background and a belief that no valuable information could be obtained. By the date of sentencing, when he was offered a final opportunity to rescind his waiver and allow additional investigation, Petitioner was fully informed of the nature, scope, and purpose of mitigating information, having spoken with counsel and Durand and having heard Durand's detailed testimony at the aggravation/mitigation hearing. After being afforded several opportunities by the judge to obtain a continuance, Petitioner chose to proceed to sentencing without a complete mitigation investigation.

Despite Petitioner's position, the defense investigation continued until the date of the aggravation/mitigation hearing, which had been extended at counsel's request. At the hearing, counsel presented testimony concerning Petitioner's childhood, alcohol dependence, gambling addiction, mental health history, and positive character traits and conduct.

Given all of these circumstances, Petitioner's claim for relief is even less persuasive than Landrigan's. Petitioner's waiver of a continuance was neither equivocal nor last-minute. The record demonstrates that he was fully aware of the consequences of his decision and persisted in that decision even after counsel's attempts to change his mind, exposure to Durand's testimony detailing the elements and potential benefits of a full-scale mitigation investigation, and repeated opportunities afforded by the court to reconsider his decision. His waiver did not prevent counsel from investigating and presenting a mitigation case within the parameters Petitioner had set. Therefore, under the clearly-established law set forth in *Landrigan*, Petitioner is not entitled to relief.

The second factor dictating a conclusion that Petitioner has not demonstrated prejudice is the nature of the new mitigating information. At Petitioner's sentencing, counsel offered what amounted to an outline of the mitigation case presented during the PCR proceedings. The information later presented by PCR counsel supported the mitigating circumstances proffered at sentencing, including Petitioner's alcohol dependence, gambling

addiction, and bipolar disorder. It also added a new diagnosis that Petitioner suffers from a cognitive deficit affecting his complex reasoning skills.

In his special verdict, Judge Kiger found that several of the nonstatutory mitigating factors advanced by defense counsel, including Petitioner's alcohol and gambling problems and his bipolar condition, had not been proved and therefore were not weighty. Dkt. 36, Ex. A at 3-5. In his PCR order, Judge Kiger considered all of the new evidence, but determined that Petitioner had not been prejudiced by counsel's performance at sentencing. Dkt. 36, Ex. C at 2. To obtain relief, Petitioner must show that Judge Kiger's determination was not merely incorrect, but "unreasonable – a substantially higher threshold." *Landrigan*, 550 U.S. at 473.

The reasonableness of Judge Kiger's ruling is supported by several considerations. First, most of the new mitigating evidence, while more detailed than the information offered at sentencing, duplicated the evidence already presented. *See Babbit*, 151 F.3d at 1176 (no prejudice where evidence omitted at sentencing was "largely cumulative of the evidence actually presented"). Thus, it did not alter the basic sentencing profile originally provided to the judge. *See Strickland*, 466 U.S. at 699-700; *see also Henley v. Bell*, 487 F.3d 379, 387-88 (6th Cir. 2007) (no prejudice resulting from counsel's failure to call a psychiatric expert to testify during sentencing phase of capital murder trial that defendant had learning disabilities, had dropped out of school, and at the time of the offense was depressed and acting out of character). To the extent that the new evidence supported a diagnosis that Petitioner suffered from a cognitive deficit, that diagnosis was the product of a single test result, which was the only indication that Petitioner was not within the normal range with respect to brain function. Moreover, Dr. Herring, who performed the test, did not herself make a diagnosis of cognitive deficit; nor could she say whether any such deficit was in place at the time of the murder, more than 10 years earlier. RT 3/17/06 at 41, 52. Therefore, the only new category of mitigating information was of limited impact.

Thus, in contrast to cases such as *Rompilla*, *Wiggins*, and *Williams*, where counsel's failure to investigate mitigating evidence prejudiced the defendant, the omitted mitigation

evidence about Petitioner's background and mental health was relatively "weak." *Landrigan*, 550 U.S. at 481. For example, in *Rompilla*, counsel failed to present evidence that his client was beaten by his father with fists, straps, belts, and sticks; that his father locked him and his brother in a dog pen filled with excrement; and that he grew up in a home with no indoor plumbing and was not given proper clothing. 545 U.S. at 391-92. In *Wiggins*, counsel failed to present evidence that the defendant suffered consistent abuse during the first six years of his life, was the victim of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," was homeless for portions of his life, and had diminished mental capacities. 539 U.S. at 535. In *Williams*, counsel failed to discover "records graphically describing Williams's nightmarish childhood," including the fact that he had been committed at age 11, had suffered dramatic mistreatment and abuse during his early childhood, and was "borderline mentally retarded." 529 U.S. at 370-71, 395. *See also Stankewitz v. Woodford,* 365 F.3d 706, 717-19 (9th Cir. 2004) (prejudice existed where omitted evidence showed that Stankewitz was exposed to extreme deprivation and abuse from his family and in a variety of foster homes, was borderline retarded, and suffered from significant brain dysfunction). In *Landrigan* itself, the Court described as "poor quality," and therefore not supportive of a colorable claim of ineffective assistance, omitted mitigating evidence indicating that the petitioner suffered from fetal alcohol syndrome with attendant cognitive and behavioral defects, was abandoned by his birth mother, was raised by an alcoholic adoptive mother, began abusing alcohol and drugs at an early age, and had a genetic predisposition to violence. 550 U.S. at 480.

By contrast, the evidence presented to the PCR court simply corroborated Petitioner's alcohol dependence, gambling addiction, and bipolar disorder, while adding a diagnosis of cognitive deficit that was neither significant nor well supported. It was not unreasonable for Judge Kiger to find that this evidence was not persuasive enough to have produced a different sentence. *See id.*; *see also Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented at

sentencing"). In sum, the mitigation case presented during the PCR proceedings "establishes at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel." *Turner v. Crosby*, 339 F.3d 1247, 1279 (11th Cir. 2003) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)).

Finally, the reasonableness of Judge Kiger's ruling is supported by the fact that he had presided at Petitioner's sentencing and was familiar with the record and the efforts of trial counsel. During the PCR proceedings, the judge was presented with the results of an exhaustive mitigation investigation. He denied relief, again finding that Petitioner had waived additional mitigation and failed to show prejudice. The Ninth Circuit has commented on the appropriate review of cases where the judge considering a claim of ineffective assistance was also the judge who presided over trial and sentencing. In *Gerlaugh*, the court denied an ineffective assistance claim and rejected the petitioner's request for an evidentiary hearing in state court, explaining:

> The trial and sentencing judge has already considered *all* of this information in the post-conviction hearing and has held that none of it would have altered his judgment as to the proper penalty for Gerlaugh. And, the Arizona Supreme Court looked at the substance and results of the post-conviction proceeding and affirmed the trial judge in all respects. In effect, petitioner has already had what he is asking for – consideration in a formal hearing of this evidence.

*Gerlaugh*, 129 F.3d at 1036; *see Smith*, 140 F.3d at 1271.

Petitioner likewise was able to discover and present all available mitigating evidence to the sentencing judge during the PCR proceedings. Petitioner received a comprehensive mitigation investigation, carried out by a full complement of investigators and experts, followed by a hearing at which all of the mitigating information was presented. Judge Kiger heard and considered the evidence and determined that if it had been presented at sentencing it would not have altered his decision to sentence Petitioner to death. This Court cannot classify as objectively unreasonable Judge Kiger's assessment of the evidence and its impact on his sentencing determination.

Conclusion

The PCR court, in rejecting Petitioner's claim of ineffective assistance of counsel at sentencing, did not apply *Strickland* in an objectively unreasonable manner. Under *Landrigan*, Petitioner's waiver of additional mitigation evidence forecloses relief. In addition, Judge Kiger did not unreasonably determined that the omitted mitigation evidence was not sufficient to result in a reasonable probability of a different sentence.

In *Owens*, the Sixth Circuit, citing *Landrigan*, cautioned that "[a] defendant cannot be permitted to manufacture a winning [ineffective assistance of counsel] claim by sabotaging her own defense, or else every defendant clever enough to thwart her own attorneys would be able to overturn her sentence on appeal." 549 F.3d at 412. That principle applies equally to Petitioner's case. Claim 1(B)(4) is denied.

**Claim 2**

Petitioner alleges that the trial court violated the Eighth Amendment prohibition against arbitrary and capricious sentencing in capital cases when it allowed Petitioner, over his counsel's objection, to determine that a continuance of the mitigation hearing was unnecessary. Dkt. 35 at 59. He further alleges that the court violated his Sixth Amendment right to counsel by ignoring defense counsel's "learned decision" that additional time was necessary to prepare mitigation in favor of Petitioner's uninformed desire to proceed to sentencing. *Id.* Respondents concede that the claim is exhausted to the extent it was raised on direct appeal. Dkt. 36 at 43-44.

Background

As explained above, Petitioner opposed a continuance of the sentencing proceedings and thereby foreclosed a complete mitigation investigation by the defense team. On direct appeal, Petitioner contended that the trial judge improperly allowed him to waive the presentation of mitigation evidence against the advice of counsel. Opening Br. at 26. The Arizona Supreme Court rejected Petitioner's argument. *Kayer*, 194 Ariz. at 434-37, 984 P.2d at 42-45. The court held that its jurisprudence does not preclude a defendant from refusing to cooperate with a mitigation specialist, explaining that a competent defendant can waive

counsel altogether and that "[a] defendant's right to waive counsel includes the ability to represent himself or herself at the sentencing phase of a case that could result in the death penalty." *Id.* at 436, 984 P.2d at 44. Therefore, according to the court, "[a]n anomaly would exist were we to accept defendant's argument that counsel exclusively controls the presentation of all mitigation evidence: a defendant could waive counsel at sentencing and thereby have exclusive control over the presentation of all mitigation evidence; yet if a defendant accepts counsel, he would have no input on what mitigating factors to offer." *Id.* at 436-37, 984 P.2d at 44-45. The court also noted that "[t]he United States Supreme Court has upheld a defendant's right to waive all mitigating evidence." *Id.* (citing *Blystone v. Pennsylvania*, 494 U.S. 299, 306 & n. 4 (1990)). The court then explained:

> [O]ur case law allows defendant the freedom not to cooperate with a mitigation specialist and thereby potentially limit the mitigation evidence that is offered. Significantly, defendant stressed to the trial judge that he wanted Durand to advocate on his behalf at the mitigation hearing. Defendant also wanted his attorneys to argue other mitigating evidence. Consequently, seven mitigating circumstances were offered. Durand testified on defendant's behalf, albeit without defendant's full cooperation. Defendant was not conceding defeat; he wanted advocacy in all areas except the psychological areas that Durand wanted to explore. . . .
>
> We conclude that the trial court properly allowed defendant not to cooperate with the court-appointed mitigation specialist, given the repeated warnings of the consequences of this decision and the factual record before us.

*Id.* at 437, 984 P.2d at 45 (citation omitted).

Analysis

Petitioner contends that the state courts violated his constitutional rights by allowing him to waive the presentation of additional mitigation and that the courts erred in finding that the waiver was knowing and voluntary. The Court disagrees.

First, as the Arizona Supreme Court noted, citing *Blystone v. Pennsylvania*, there is no dispute that a defendant may waive the presentation of mitigating evidence. In *Blystone*, the United States Supreme Court held that no constitutional violation occurred when a defendant was allowed to waive all mitigation evidence after repeated warnings from the judge and advice from counsel. 494 U.S. 299, 306 & n.4. That principle was buttressed by the holding in *Landrigan*, which denied an ineffective assistance claim based on the

defendant's refusal to allow the presentation of a mitigation case.  550 U.S. at 475.  Therefore, the fact that the trial court accepted Petitioner's waiver of a more detailed mitigation case does not, by itself, establish a constitutional violation.

Petitioner asserts that his waiver was not knowing and voluntary because he did not understand the consequences of his decision.  This argument is unavailing on both legal and factual grounds.  In *Landrigan*, the Supreme Court explained that it had "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence" and has "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Landrigan*, 550 U.S. at 479.

In Petitioner's case, nonetheless, the state courts reasonably found that his waiver was informed and voluntary.  Judge Kiger afforded Petitioner repeated opportunities to reconsider his decision to limit the mitigation defense, ensured that Petitioner discussed the matter fully with counsel, determined that Petitioner had discussed the matter at length with his mitigation specialist, and afforded Petitioner an opportunity to reconsider the decision after he had heard the testimony at his own mitigation hearing.  The judge determined that Petitioner "voluntarily prohibited his attorneys from further pursuing and presenting any possible mitigating evidence." Dkt. 36, Ex. A at 2.

The judge was "ideally situated" to make this assessment, and his factual findings are presumed correct. *Landrigan*, 550 U.S. at 474, 476; *see* 28 U.S.C. § 2254(e)(1).  Petitioner has not met his burden of rebutting that presumption with clear and convincing evidence.  By the time of the sentencing hearing, when Petitioner again waived a continuance, he was fully aware of the nature and purpose of a mitigation investigation and its significance to his case.  Durand's testimony at the aggravation/mitigation hearing alone was adequate to apprise Petitioner of the ramifications of his waiver.  And Petitioner's colloquies with Judge Kiger further support a finding that his decision to limit the mitigation case was informed and voluntary. *See* RT 6/6/97 at 15-21; RT 7/8/97 at 71; RT 7/15/97 at 8.

The ruling of the Arizona Supreme Court rejecting this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an

unreasonable determination of the facts.  Therefore, Claim 2 is denied.

**Claim 3**

Petitioner alleges that he was denied effective assistance of counsel because trial counsel labored under a conflict of interest. Dkt. 35 at 67.  Petitioner concedes that the claim is unexhausted because he failed to include it in his petition for review to the Arizona Supreme Court. Dkt. 40 at 30.  He contends, however, that he has an available state court remedy under Rule 32.2 because his waiver of the claim was not knowing, voluntary, and intelligent, and he requests a stay of these proceeding so that he may return to state court and exhaust the claim. *Id.* The Court concludes that the claim, regardless of its procedural status, is plainly without merit. *See* 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

Analysis

To establish an ineffective assistance of counsel claim based on a conflict of interest, it is not sufficient to show that a "potential" conflict existed. *Mickens v. Taylor*, 535 U.S. 162, 171 (2002).  Rather, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  An actual conflict of interest for Sixth Amendment purposes is one that "adversely affected counsel's performance." *Mickens*, 535 U.S. at 171.  Petitioner has not established that his attorneys actively represented conflicting interests or that any conflict of interest affected their performance.

At trial, lead counsel Stoller cross-examined the victim's widow, Wilma Haas.  Near the conclusion of her testimony, Stoller asked for a sidebar conference.  RT 3/19/97 at 57. He informed the court, the prosecutor, and Kayer that after observing Haas testify, he believed he may have represented her son by a prior marriage a few years earlier on DUI charges in Phoenix. *Id*. at 57-58.  The prosecutor and Stoller questioned Haas outside the presence of the jury. *Id*.  She confirmed that Stoller had represented her son, but stated that they had no contact regarding this case. *Id*. at 69-70.  Under these circumstances, Petitioner

has not established that an actual conflict existed based on Stoller's prior representation of the victim's widow's son. Nor does Petitioner explain how Stoller's prior representation adversely affected his performance.

Petitioner contends that second counsel Victor was burdened with a conflict of interest based on his representation of an inmate named Pierce. Prior to Kester's testimony, the State filed a motion in limine to preclude the admission of various acts to impeach Kester. ROA 147, 148. One of those acts concerned an altercation between Kester and Pierce in the women's dorm of the Yavapai County Jail. *Id.* Later, while discussing the motion in court, the judge noted that Victor had represented Pierce on a different matter. RT 3/12/97 at 6.

Contrary to Petitioner's assertion that "Victor's loyalty to his prior client . . . prevented him from being able to use such information to impeach Kester," Dkt. 35 at 69, Victor forcefully argued that the dorm incident should be admissible to impeach Kester on cross-examination by showing that she was not the weak and submissive individual portrayed by the State. The court disagreed and precluded use of the incident. *Id.* at 6-7, 170-74. Petitioner therefore has failed to demonstrate that Victor's representation of Pierce affected his performance as Petitioner's counsel.

Claim 3 is without merit and will be denied.

**Claim 4**

Petitioner alleges that his right to trial by an impartial and representative jury under the Sixth and Fourteenth Amendments was violated when the trial court death-qualified his jury. Dkt. 35 at 69. Respondents concede that this claim is exhausted. Dkt. 36 at 50.

Prior to trial Judge Kiger informed the parties that during voir dire he would explain to the jurors that the death penalty was a possible sentence, but that the judge, not the jurors, determined the sentence. After providing such information the judge would then ask if the juror could still be fair and impartial. RT 5/5/97 at 7-8. Judge Kiger overruled defense counsel's "vehement" objection to this process. *Id.* at 12.

Judge Kiger questioned the jurors in groups of three, asking each juror, "knowing what your duty as a juror is, do you believe that this kind of a case [a potential death penalty

case] would be such that you could not be a fair and impartial juror?" *See, e.g.*, RT 3/6/97 at 36-38. Upon receiving confirmation that a particular juror would be fair and impartial, the judge asked no further questions regarding the death penalty.[9] *Id.*

On direct appeal, the Arizona Supreme Court, relying on its own precedent as well as *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), and *Adams v. Texas*, 448 U.S. 38, 45 (1980), held that "voir dire questioning related to a juror's views on capital punishment is permitted to determine whether those views would prevent or substantially impair the performance of the juror's duties to decide the case in accordance with the court's instructions and the juror's oath." *Kayer*, 194 Ariz. at 431, 984 P.2d at 39 (quoting *State v. Martinez-Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985)).

The Arizona Supreme Court reasonably applied clearly established federal law, which holds that the death-qualification process in a capital case does not violate a defendant's right to a fair and impartial jury. *See Lockhart v. McCree*, 476 U.S. 162, 178 (1986); *Witt*, 469 U.S. at 424; *Adams*, 448 U.S. at 45 (1980); *see also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (death qualification of Arizona jurors not inappropriate). The fact that the trial court death-qualified the venire does not establish a federal constitutional violation. Petitioner is not entitled to relief on Claim 4.

**Claim 5**

Petitioner alleges that his right to trial by an impartial and representative jury under the Sixth and Fourteenth Amendments was violated when the trial court dismissed a juror because of his views concerning the death penalty. Dkt. 35 at 73. Respondents concede that the claim is exhausted. Dkt. 36 at 53.

Background

Only one juror was excused as a result of the death-qualification questioning

---

[9] During this process, Stoller asked each of the potential jurors their views about the role of the jury in a criminal trial, with his questions focusing on the guilt rather than sentencing phase of the trial. *See, e.g.*, RT 3/6/97 at 40.

described above. In response to inquiries by Judge Kiger, juror Ed DeMar indicated that he had "reservations" about a proceeding that involved the potential of a death sentence. RT 3/6/97 at 91. Rather than have DeMar explain further, Judge Kiger asked him to step outside so that questioning could continue with the two jurors who had not expressed concern regarding the death penalty. *Id.* at 91-92. DeMar was then brought before the judge and the parties, and the following exchange took place:

Court:      So we are talking about whether or not you had any personally-held beliefs, philosophical opinions, or religious convictions that would get in the way and make it difficult or impossible for you to be a fair and impartial juror knowing that the death penalty was a possibility.

DeMar:      Yes. That would be a – I would have reservations about an action in which the death penalty might be imposed or could be imposed.

Court:      Let me emphasize, again, though, your duty as a juror is to – and there is a specific instruction that I'm going to give these jurors, do not consider the possible punishment in making your deliberations.

DeMar:      Well, that would put me in a sort of difficult position.

Court:      That's why I'm asking the question.

            . . . .

DeMar:      I'm not opposed to the death penalty, but I – it would depend on the conditions involving questions of premeditation, of stalking, of cruelty, of a particularly heinous crime, of multiple deaths, things of the sort that would tend to follow the Federal application of the death penalty rather than the State application.

            And that's what would perhaps give me some difficulty. If I – and also the question of degree, whether it's first degree, second, third, or manslaughter. Those things would be considerations that I think would affect my impartiality, if I knew that the State had stated that it might seek the death penalty, not knowing those other conditions.

            In other words, conditionally, I would not necessarily be against the death penalty, but I would be looking toward the kinds of things that I told you that would – would perhaps affect that decision.

            . . . .

Court:      And I guess – and listen carefully. I'm going to try to summarize what you're telling me so that I can understand it. And if I'm missing the point, I'll trust that you will try to help me. But what you're saying to me seems like knowing that there is that possibility of the death penalty out there would be bumping into your thoughts on, making it –

| | |
|---|---|
| DeMar: | Yes. I would need to know more, really, and it doesn't mean that I'd be against it, but it means that under certain conditions I would, and not knowing those other factors would trouble me somewhat. |
| Court: | And would it get in your way, then, of being a fair and impartial juror as the process continued? |
| DeMar: | It might, again depending on what – how much of a factor became evidence in testimony and what have you. |
| Court: | Okay. |
| DeMar: | But it would not be – be a hands-down opposition to the death penalty as such. |
| Court: | I understand what you're saying, and of course at this point we are looking for whether or not you can work in this trial as a fair and impartial juror to both defendant and the State. |
| DeMar: | I understand. |
| Court: | Let me – let me try it this way, to – knowing what you know right now, knowing your personal opinions and beliefs and what you know the job of the juror to be, because this is a possibility of a death penalty case at this point, would you like me to excuse you from jury duty in this case? |
| DeMar: | I think that probably would be fair to the – to the State and to the defense, both really, since that reservation is honestly held. |
| Court: | Okay. Okay. Mr. DeMar, I'm going to accept what you tell me. I'm going to thank you for spending now a day and a half with us and putting up with all of our questioning, and I'm going to excuse you from jury duty in this case, with our sincere appreciation. |

*Id.* at 98-101. Neither party challenged DeMar for cause or objected to his excusal. *Id.*

On direct appeal, Petitioner argued that DeMar's dismissal was not supported by a finding that his views on the death penalty would prevent him from performing his duties as a juror. Opening Br. at 18-20. The Arizona Supreme Court rejected this claim, explaining:

> [T]he judge was willing to allow DeMar to continue as a potential juror upon a simple assurance that DeMar could be fair and impartial. Because DeMar could not give such an assurance, he accepted the court's decision that he be excused from the jury panel in order to be fair to both the defendant and the State.
>
> Similarly, our case law is clear that a trial judge must excuse any potential jurors who cannot provide assurance that their death penalty views will not affect their ability to decide issues of guilt. *See Detrich,* 188 Ariz. at 65, 932 P.2d at 1336 (urging as "imperative" the dismissal of any juror who cannot assure impartiality on guilt issues because of views regarding the death

penalty (citing *State v. Hyde,* 186 Ariz. 252, 921 P.2d 655 (1996))). Thus, the trial court did not err in asking DeMar questions regarding the death penalty, nor did the court err in allowing DeMar to be excused from jury service given the presence of "honestly held" reservations regarding the death penalty that might have affected DeMar's ability to carry out his oath with respect to issues of guilt.

*Kayer*, 194 Ariz. at 431-32, 984 P.2d at 39-40.

Analysis

Clearly established Supreme Court law provides that, when selecting a jury in a capital case, jurors cannot be struck for cause "because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 & n.21 (1968) (noting that exclusion for cause is appropriate if views on the death penalty would "prevent them from making an impartial decision as to the defendant's guilt"). Therefore, "[a] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. at 45; *see Wainwright v. Witt*, 469 U.S. at 424.

In Petitioner's case, the record indicates that DeMar was not challenged for cause. Instead, at the end of a colloquy in which he consistently expressed reservations about his ability to sit as a fair and impartial juror in a death penalty case, the judge asked him if he would prefer to be excused. He stated that he would, in fairness to both parties, and neither Petitioner nor the State objected.[10] Under these circumstances, Petitioner cannot demonstrate that the Arizona Supreme Court unreasonably applied *Witherspoon* in rejecting this claim.

Even assuming that DeMar was struck for cause, under *Uttecht v. Brown*, 551 U.S. 1 (2007), Petitioner would not be entitled to relief. In *Uttecht* the prosecution struck for cause a panel member referred to as "Juror Z." *Id.* at 5. Juror Z initially indicated that he

---

[10] During the PCR evidentiary hearing, both Stoller and Victor testified that they did not want DeMar on the jury. RT 3/16/06 at 42; RT 3/22/06 at 96.

could impose the death penalty in "severe situations"– for example, if a defendant would inevitably re-offend if released. *Id.* at 14-15. When informed by defense counsel that the defendant would never be released from prison, Juror Z expressed uncertainty about his ability to impose a death sentence. Pressed by the prosecution, he continued to equivocate regarding his willingness to consider the death penalty in the circumstances of the case before him, though he generally stated "that he could consider the death penalty or follow the law." *Id.* at 15. The prosecution challenged Juror Z for cause, citing his confusion about the proper circumstances for the imposition of a death sentence. The defense indicated that it had no objection, and the trial court excused the juror. The Ninth Circuit granted habeas relief on the grounds that the state courts had not made a finding that the juror was "substantially impaired" and that "the transcript unambiguously proved Juror Z was not substantially impaired." *Id.* at 15-16. The Supreme Court reversed, holding that the record established that Juror Z "had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case." *Id.* at 13. As illustrated above, DeMar in his colloquy with Judge Kiger demonstrated similar characteristics – confusion about his role as a juror and an attitude toward the death penalty suggesting that he might have been unable to serve as a fair and impartial juror. Indeed, DeMar himself stated that he thought his excusal from the jury would be fair to the State and the defense.

In addition, if, as Petitioner contends, Judge Kiger dismissed DeMar for cause after finding that his ability to be fair and impartial was substantially impaired due to his beliefs about the death penalty, then the judge's determination was "based in part on [DeMar's] demeanor" and is "owed deference by reviewing courts." *Id.* at 8. Judge Kiger had "broad discretion" to dismiss DeMar after conducting a "diligent and thoughtful voir dire" that revealed "considerable confusion" on the part of the juror. *Id.* at 20.

Petitioner notes that DeMar indicated that he was not unambiguously opposed to the death penalty and would vote to apply it in certain circumstances. But "such isolated statements indicating an ability to impose the death penalty do not suffice to preclude the

prosecution from striking for cause a juror whose responses, taken together, indicate a lack of such ability or a failure to comprehend the responsibilities of a juror." *Morales v. Mitchell*, 507 F.3d 916, 941 (6th Cir. 2007).

The Arizona Supreme Court did not unreasonably apply clearly established federal law in rejecting this claim on appeal. Therefore, Claim 5 is denied.

**Claim 6**

Petitioner alleges that the state courts violated his rights to due process and to be free from cruel and unusual punishment under the Fifth, Eighth, and Fourteenth Amendments by finding that he committed the murder with the expectation of the receipt of anything of pecuniary value under A.R.S. § 13-703(F)(5). Dkt. 35 at 76. Petitioner contends that "[t]he State failed to prove beyond a reasonable doubt that Petitioner's motive was not revenge or some other reason beyond the expectation of pecuniary gain." *Id.* at 77.

Respondents counter that Claim 6 is unexhausted and procedurally barred. Dkt. 36 at 56. They correctly note that on direct appeal Petitioner did not allege a violation of his federal constitutional rights but argued only that the factor had not been proved. *See* Opening Br. at 31-37. The Arizona Supreme Court, however, considered the pecuniary gain aggravating factor during its independent sentencing review. *Kayer*, 194 Ariz. at 433-34, 984 P.2d at 41-42. This Court must determine whether that review exhausted the claim.

The Arizona Supreme Court independently reviews each capital case to determine whether the death sentence is appropriate. In *State v. Gretzler,* 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983), the court stated that the purpose of independent review is to assess the presence or absence of aggravating and mitigating circumstances and the weight to give to each. To ensure compliance with Arizona's death penalty statute, the state supreme court reviews the record regarding aggravation and mitigation findings and decides independently whether the death sentence should be imposed. *State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d 783, 790-91 (1992). The Arizona Supreme Court has also stated that in conducting its review it determines whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factors. *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41,

51 (1976), *sentence overturned on other grounds, Richmond v. Cardwell,* 450 F.Supp. 519 (D. Ariz. 1978). Arguably, such a review rests on both state and federal grounds. *See Brewer*, 170 Ariz. at 493, 826 P.2d at 790 (finding that statutory duty to review death sentences arises from need to ensure compliance with constitutional safeguards imposed by the Eighth and Fourteenth Amendments).

While the state supreme court's independent review does not encompass all alleged constitutional errors at sentencing, the Court must determine if it encompassed Petitioner's claim that the trial court erred in finding the pecuniary gain aggravating factor. In its written opinion, the Arizona Supreme Court reviewed the aggravating factors found by the sentencing judge to determine their existence and whether a death sentence was appropriate. *Kayer*, 194 Ariz. at 432-33, 984 P.2d at 40-41. With respect to the pecuniary gain factor, the supreme court reviewed the evidence in the record and determined that the pecuniary gain factor had been satisfied. *Id.* at 433-34, 984 P.3d at 41-42. The supreme court's actual review of the trial court's finding of the (F)(5) factor sufficiently exhausted Claim 16. *See Sandstrom v. Butterworth,* 738 F.2d 1200, 1206 (11th Cir. 1984). Thus, the Court finds that Claim 6 was actually exhausted, and it will be reviewed on the merits.

<u>Analysis</u>

In rejecting this claim on appeal, the Arizona Supreme Court explained:

> The State proved pecuniary gain in this case beyond a reasonable doubt. Kester and other witnesses testified that defendant continually bragged about his gambling system and observed his addictive behavior of constantly wanting money with which to gamble. Kester testified that defendant said he planned to steal from Haas and then kill him so that defendant could get away with killing someone he knew. Defendant took Haas' money, credit cards, and other personal items from the crime scene. Kester testified that defendant also took Haas' house keys after the murder, entered the home, and stole several additional items of personal property. Another witness at trial observed Kester and defendant at Haas' home at about the time established by Kester. Pawn shop receipts and witness testimony established that after Haas was murdered, defendant sold virtually all of Haas' jewelry and guns. In short, the State presented overwhelming circumstantial and direct evidence that defendant killed with the expectation of pecuniary gain. This proof far exceeds the requirement that pecuniary gain must be only a motive for the crime.

*Kayer*, 194 Ariz. at 433-34, 984 P.2d at 41-42.

With respect to a state court's application of an aggravating factor, habeas review "is

limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

"[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the murder, not merely the result of the murder." *Moormann v. Schriro*, 426 F.3d 1044, 1054 (9th Cir. 2005). Based upon the evidence produced at trial, a rational factfinder could have determined that Petitioner, short of cash from his gambling losses, planned and carried out the murder of Haas in order to gain access to the victim's property.

Petitioner argues that additional motives may have led to the killing. As the Arizona Supreme Court noted, however, "[t]he State can establish pecuniary gain beyond reasonable doubt through presentation of direct, tangible evidence or through strong circumstantial evidence," and a "financial motive need not be the only reason the murder was committed for the pecuniary gain aggravator to apply." *Kayer*, 194 Ariz. at 434, 984 P.2d at 42. Here, Kester's testimony of a financial motive for the killing is corroborated by circumstantial evidence concerning the missing property and the sale of items belonging to Haas. Thus, application of the pecuniary gain factor was not unreasonable even if other motives for the killing may have existed. Petitioner is not entitled to relief on Claim 6.

**Claim 7**

Petitioner alleges that the state courts violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments when they determined that the prosecution had proven as an aggravating factor that Petitioner was previously convicted of a serious offense under A.R.S.

§13-703(F)(2). Dkt. 35 at 78. Respondents contend that the claim is unexhausted and procedurally barred. Dkt. 36 at 57. For the reasons set forth above with respect to the pecuniary gain factor, the Court concludes that this claim was exhausted by the Arizona Supreme Court's independent review of Petitioner's sentence.

In its special verdict, the trial court indicated that it had "received and reviewed the documents submitted by the State" with respect to Petitioner's first-degree burglary conviction. Dkt. 36, Ex. A at 1. On direct appeal, the Arizona Supreme Court upheld the trial court's application of the (F)(2) factor. *Kayer*, 194 Ariz. at 433, 984 P.2d at 41. The court stated, in relevant part:

> The State presented documentation of defendant's 1981 conviction of first-degree burglary. Based on this documentation, the court determined the (F)(2) aggravator had been proved beyond a reasonable doubt. The State thus met its burden of showing that defendant had been previously convicted of a "serious offense" under section 13-703(F)(2).

*Id.*

Petitioner asserts that the trial court based its findings regarding the prior conviction on documents it had reviewed but that had not properly been admitted into evidence. In affirming the application of (F)(2), Petitioner contends that "the supreme court ignored the fact the trial court did not admit any evidence regarding this potential aggravating circumstance" and thereby "violated its own precedent." Dkt. 35 at 80.

Even assuming that the state courts erred by failing to admit into evidence the records of Petitioner's first-degree burglary conviction, Petitioner is not entitled to habeas relief. A state court's error in applying state law does not warrant federal habeas corpus relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1981). On habeas review, this Court is limited to determining whether the state court's application of state law was so arbitrary and capricious that it amounted an independent due process or Eighth Amendment violation. *Lewis v. Jeffers*, 497 U.S. at 780.

Claim 7 does not meet this standard. Petitioner does not contest the existence of the prior conviction or contend that it fails to satisfy the statutory definition of a serious offense. He simply argues that the trial court considered the documents proving the conviction

without first having admitted them into evidence. The state supreme court found that the record presented to the trial court was sufficient to prove that Petitioner had previously been convicted of a serious offense under § 13-703(F)(2). Whether or not the Arizona Supreme Court erred in upholding the process by which the prior conviction was proved, the state courts' application of the (F)(2) factor, under the circumstances described above, was not so arbitrary and capricious as to constitute an independent constitutional violation. Claim 7 is therefore denied.

**Claims 8 and 10**

In Claim 8, Petitioner alleges that the "trial court violated [his] rights under the Eighth and Fourteenth Amendments . . . when it failed to find and/or consider mitigating circumstances established by the record." Dkt. 35 at 80. In Claim 10, Petitioner alleges that the trial court and the Arizona Supreme Court violated his Eighth and Fourteenth Amendment right to the consideration of all relevant mitigation evidence by refusing to consider mitigating factors that did not have a "causal nexus" to the crime. Dkt. 35 at 85.

On direct appeal, Petitioner did not allege that his federal constitutional rights were violated by the manner in which the trial court considered the proffered mitigating circumstances. *See* Opening Br. at 37. He simply argued, with no citation to the federal constitution or relevant case law, that the trial court erred in not finding that the mitigating circumstances had been proved. *Id.* Therefore, he failed to exhaust Claims 8 and 10 on direct appeal. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).

Petitioner raised the allegations contained in Claims 8 and 10 for the first time in Claim 1 of his PCR petition. PCR Pet. at 1-3. The court found the claim precluded under Rule 32.2(a)(3). Dkt. 36, Ex. B at 1. Respondents contend, therefore, that Claims 8 and 10 are procedurally barred. Dkt. 36 at 59. Petitioner counters that the PCR court's ruling was erroneous because the claims could not have been raised on direct appeal because they challenge the holding of the Arizona Supreme Court. The Court disagrees. A petitioner seeking habeas relief has not properly exhausted a claim "if he has the right under the law of the State to raise, *by any available procedure*, the question presented." 28 U.S.C.

§ 2254(c) (emphasis added). Thus, a petitioner "must present his claims to a state supreme court in a petition for discretionary review" in order to properly exhaust a claim in state court. *O'Sullivan v. Boerckel*, 526 U.S. at 839-40. A motion for reconsideration is "an avenue of relief that the Arizona Rules of Criminal Procedure clearly outline." *Correll v. Stewart*, 137 F.3d 1404, 1418 (9th Cir. 1998); *see Styers v. Schriro*, 547 F.3d 1026, 1034 (9th Cir. 2008). Petitioner could have raised these claims in his motion for reconsideration to the Arizona Supreme Court following the denial of his direct appeal. He did not. *See* PCR Pet., Ex. 29. Therefore, the PCR court did not err in finding the claims precluded as waived pursuant to Rule 32.2(a)(3).

Alternatively, Petitioner offers ineffective assistance of appellate counsel as cause for the default.[11] Dkt. 40 at 39, 43. Where ineffective assistance of appellate counsel is raised as cause for excusing a procedural default, application of *Strickland* requires the Court to look to the merits of the omitted issue. *Hain v. Gibson*, 287 F.3d 1224, 1231 (10th Cir. 2002); *United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995) (to determine if appellate counsel provided ineffective assistance by failing to raise an issue on appeal "we examine the merits of the omitted issue"). If the omitted issue is meritless, counsel's failure to appeal does not constitute a Sixth Amendment deprivation. *Cook*, 45 F.3d at 392-93. The Court concludes, as set forth below, that Claims 8 and 10 lack merit. Therefore, appellate counsel was not ineffective for failing to raise them and ineffective assistance of appellate counsel does not excuse their default.

Background

As detailed above, the trial court found that Petitioner had failed to prove the nonstatutory mitigation evidence proffered at sentencing regarding his substance abuse and mental health, finding that Petitioner had established neither the existence of the conditions

---

[11] As discussed below in Claim 22, Petitioner exhausted his claims of ineffective assistance of appellate counsel by raising them in his PCR petition and petition for review. PCR Pet. at 46; PR doc. 9 at 31.

nor their effect on his behavior at the time of the murders. Dkt 36, Ex. A at 3-4. In his special verdict, Judge Kiger stated that he had "considered" all of the nonstatutory mitigating circumstances but found them of "essentially no weight." *Id.* at 5.

The Arizona Supreme Court agreed "that impairment was not established as a nonstatutory mitigating factor by a preponderance of the evidence," explaining that "in addition to offering equivocal evidence of mental impairment, defendant offered no evidence to show the requisite causal nexus that mental impairment affected his judgment or his actions at the time of the murder." *Kayer*, 194 Ariz. at 438, 984 P.2d at 46. In considering other nonstatutory mitigating circumstances, the Arizona Supreme Court found that Petitioner's poor "post-murder physical health" was entitled to "no weight" as a mitigating factor because it did not bear on his pre-murder character or his propensities, record, or other circumstances of the offense. *Id.* at 440, 984 P.2d at 48. The court likewise found that Petitioner's intelligence and ability to contribute to society did not constitute a mitigating factor. *Id.*

Analysis

The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background [or to emotional and mental problems] may be less culpable than defendants who have no such excuse." *Wiggins*, 539 U.S. at 535 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Therefore, a sentencing court is required to consider any mitigating information offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996). In *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *See also Burger v. Kemp*, 483 U.S. 776, 789 n.7 (1987). While the sentencer must not be foreclosed from considering

- 53 -

relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence."); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (explaining that mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence).

On habeas review, a federal court does not evaluate the substance of each piece of evidence submitted as mitigation. Instead, it reviews the record to ensure the state court allowed and considered all relevant mitigating information. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1227 (2008) (rejecting claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant). In *LaGrand v. Stewart*, 133 F.3d 1253, 1263 (9th Cir. 1998), the Ninth Circuit discussed the habeas court's role when considering whether the state court properly weighed mitigation evidence:

> federal courts do not review the imposition of the sentence *de novo*. Here, as in the state courts' finding of the existence of an aggravating factor, we must use the rational fact-finder test of *Lewis v. Jeffers*. That is, considering the aggravating and mitigating circumstances, could a rational fact-finder have imposed the death penalty?

Applying these principles, it is apparent in Petitioner's case that the trial court and the Arizona Supreme Court fulfilled their constitutional obligation by allowing and considering all of the mitigating evidence. As noted above, the trial court and the state supreme court discussed the mitigating circumstances advanced by Petitioner at sentencing, including his family background, mental health, and history of substance abuse. The fact that the courts found the mitigating information not weighty enough to call for leniency does not amount

to a constitutional violation. *Eddings*, 455 U.S. at 114-15. This is true notwithstanding the courts' discussion of the lack of a causal link between the mitigating circumstances and the crime.

In *Tennard v. Dretke*, 542 U.S. 274, 289 (2004), the Supreme Court held that the habeas petitioner was entitled to a certificate of appealability on his claim that Texas's capital sentencing scheme failed to provide a constitutionally adequate opportunity to present his low I.Q. as a mitigating factor. The Court rejected the "screening" test applied by the Fifth Circuit, according to which mitigating information is constitutionally relevant only if it shows "uniquely severe" circumstances to which the criminal act was attributable. *Id.* at 283-84. Instead, the Court explained, the test for the relevance of mitigation evidence is the same standard applied to evidence proffered in other contexts – namely, whether the evidence has any tendency to make the existence of any fact that is of consequence to a determination of the action more or less likely than it would be without the evidence. *Id.* at 284.

The courts in Petitioner's case did not impose any barrier to consideration of the proffered mitigation. To the contrary, the trial court and the Arizona Supreme Court explicitly considered the evidence of Petitioner's mental health issues and substance abuse history. Again, no constitutional violation occurred when the state courts, perceiving the lack of a causal or explanatory relationship between the mitigating evidence and Petitioner's criminal conduct, assigned less weight to that evidence than Petitioner believes it warranted. *See Eddings*, 455 U.S. at 114-15; *Ortiz*, 149 F.3d at 943. In addition, contrary to Petitioner's arguments in Claim 8, the courts considered his current poor health and his ability to contribute to society, but found they were not mitigating because they did not relate to his character, record, or the circumstances of the offense. This determination was permissible. *See Lockett*, 438 U.S. at 604 n.12 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or circumstances of the offense.").

The United States Supreme Court has emphasized that there is no required formula

for weighing mitigating evidence; indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Zant v. Stephens*, 462 U.S. 862, 875 (1983); *see Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here."); *Harris v. Alabama*, 513 U.S. 504, 512 (1995) (Constitution does not require that a specific weight be given to any particular mitigating factor); *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994). This Court knows of no Supreme Court precedent holding that mitigation evidence, once presented and under consideration, is entitled to a particular weight or that it is inappropriate for a sentencer, when weighing such evidence, to consider, along with its humanizing impact, the extent to which the evidence offers an explanation of the criminal conduct.[12]

Conclusion

Neither the trial court nor the Arizona Supreme Court violated Petitioner's rights in their evaluation of proffered mitigation evidence. Claims 8 and 10 are meritless. Appellate counsel was not ineffective because if had he raised the claims in a motion for reconsideration there is no likelihood the Arizona Supreme Court would have granted relief. Therefore, Petitioner has failed to establish cause to his excuse the default of Claims 8 and 10 and the claims are procedurally barred.

**Claim 9**

Petitioner alleges that execution by lethal injection, as it will be imposed, is cruel and unusual punishment in violation of his rights under the Eighth and Fourteenth Amendments

---

[12]   The Ninth Circuit has recognized that mitigating evidence may serve both a "humanizing" and an "explanatory" or "exculpatory" purpose, with greater weight generally being ascribed to the latter category. *See Allen v. Woodford*, 395 F.3d 979, 1005-10 (2005).

of the United States Constitution. Dkt. 35 at 82. This claim was raised on direct appeal and rejected by the Arizona Supreme Court. *Kayer*, 194 Ariz. at 441, 984 P.2d at 49.

Petitioner is not entitled to habeas relief on this claim. The United States Supreme Court has never held that lethal injection constitutes cruel and unusual punishment, *see Baze v. Rees*, 128 S. Ct. 1520 (2008), and the Ninth Circuit has concluded that death by lethal injection in Arizona does not violate the Eighth Amendment. *See LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998); *Poland v. Stewart*, 117 F.3d 1094, 1104-05 (9th Cir. 1997); *see also Dickens v. Brewer*, 07-CV-1770, 2009 WL 1904294 (D. Ariz. July 1, 2009) (Arizona's lethal injection protocol does not violate Eighth Amendment). Therefore, the Arizona Supreme Court's rejection of the claim was neither contrary to nor an unreasonable application of clearly established federal law. Claim 9 is denied.

**Claim 11**

Petitioner alleges that he was denied a jury finding beyond a reasonable doubt on the facts that increased his sentence beyond the maximum imposable in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Dkt. 35 at 94. The PCR court found this claim precluded under Rule 32.2(a)(3), and Respondents contend that it is unexhausted and procedurally barred. Dkt. 36 at 68-69. Regardless of the claim's procedural status, it is plainly meritless and will be denied. *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.

Petitioner asserts that he "is entitled to the benefit of the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and that the holding in *Schriro v. Summerlin*, 542 U.S. 348 (2004), does not apply to his case.[13] Dkt. 35 at 95-96. These propositions are premised on Petitioner's claim that his conviction became final after the decision in *Apprendi* – on January 25, 2001, when the Arizona Supreme Court issued its mandate in Petitioner's case,

---

[13] *Apprendi* held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. 530 U.S. at 489.

as opposed to February 28, 2000, when the United States Supreme Court denied his petition for writ of certiorari.[14] Petitioner is incorrect. "State convictions are final 'for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.'"[15] *Beard v. Banks*, 542 U.S. 406, 411 (2004) (quoting *Caspari v. Bohlen,* 510 U.S. 383, 390 (1994)). Petitioner's case was final when his petition for writ of certiorari was denied, which occurred prior to June 26, 2000, the date on which *Apprendi* was decided.

At the time of Petitioner's sentencing, Supreme Court precedent held that judges could find the aggravating circumstances that made a defendant eligible for capital punishment. *Walton v. Arizona*, 497 U.S. 639, 647-49 (1990). That law changed with *Ring v. Arizona*, 536 U.S. 584 (2002), but *Schriro v. Summerlin* 542 U.S. 348, 358 (2004), held that *Ring* announced a new procedural rule that does not apply retroactively to cases, like Petitioner's, that were already final on direct review at the time *Ring* was decided. Notwithstanding the inapplicability of *Ring* to his case, Petitioner counters that *Apprendi* "is sufficient to establish the Sixth Amendment violation requiring relief from his death sentence." Dkt. 35 at 96. This argument is unavailing because *Apprendi*, like *Ring*, does not apply retroactively, *see Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1245-46 (9th Cir. 2005), and, as just discussed, Petitioner's conviction was final before *Apprendi* was decided. Claim 11 is therefore denied.

**Claim 12**

Petitioner alleges that his death sentence violates his jury trial rights under the Fifth, Sixth, and Fourteenth Amendments because the aggravating factors alleged by the State were

---

[14]  *Kayer v. Arizona*, 528 U.S. 1196 (2000) (mem.).

[15]  Petitioner asserts that for purposes of retroactivity analysis, an Arizona conviction becomes final only with the issuance of the mandate because until that point an appellate court may still modify the sentence. Dkt. 40 at 46-47. He offers no support for this proposition, and the Court rejects it as contrary to *Banks*.

not presented in an indictment and subjected to a pretrial probable cause determination. Dkt. 35 at 101. The PCR court found this claim precluded under Rule 32.2(a)(3). Respondents' argument that the claim is procedurally barred, but the Court will address the claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.

While the Due Process Clause guarantees defendants a fair trial, it does not require the states to observe the Fifth Amendment's provision for presentment or indictment by a grand jury. *Hurtado v. California,* 110 U.S. 516, 538 (1884); *Branzburg v. Hayes,* 408 U.S. 665, 688 n.25 (1972). Although Petitioner contends that *Ring* and *Apprendi* support his position in this claim, in neither case did the Supreme Court address the issue, let alone hold that aggravating factors must be included in an indictment and subjected to a probable cause determination. *See Ring*, 536 U.S. at 597 n.4. Moreover, the Arizona Supreme Court has expressly rejected the argument that *Ring* requires that aggravating factors be alleged in an indictment and supported by probable cause. *McKaney v. Foreman,* 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004). Claim 12 is without merit and will be denied.

**Claim 22**

Petitioner cites several instances in which he was denied effective assistance of counsel on appeal in violation of his rights under the Sixth and Fourteenth Amendments. Dkt. 35 at 119. Respondents contend that the claim is unexhausted because Petitioner failed to include it in his petition for review to the Arizona Supreme Court. Dkt. 36 at 82. Petitioner counters that he did raise a claim of ineffective assistance of appellate counsel in his petition for review. Dkt. 40 at 62.

In his PCR petition, Petitioner raised the allegations of ineffective assistance of appellate counsel contained in his habeas petition. PCR Pet. at 45. The court found the claims "not colorable" because "the prejudice portion of the *Strickland* test has not been met." Dkt. 36, Ex. B at 2. In his petition for review, Petitioner raised such allegations as a defense against the preclusion rulings reached by the PCR court. *See* PR doc. 9 at 31. The Court finds that this was sufficient to exhaust the allegations and will consider Claim 22 on the merits.

<u>Analysis</u>

The Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). A claim of ineffective assistance of appellate counsel is reviewed under the standard set out in *Strickland*. *See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). A petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

"A failure to raise untenable issues on appeal does not fall below the *Strickland* standard." *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002); *see also Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel could not be found to have rendered ineffective assistance for failing to raise issues that "are without merit"); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985). Moreover, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a petitioner. *Miller,* 882 F.2d at 1434 n.10 (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)); *see Smith v. Stewart*, 140 F.3d at 1274 n.4 (counsel not required to file "kitchen-sink briefs" because doing so "is not necessary, and is not even particularly good appellate advocacy"). Courts have frequently observed that the "weeding out of weaker issues is . . . one of the hallmarks of effective appellate advocacy." *Miller*, 882 F.2d at 1434; *see Smith v. Murray*, 477 U.S. 527, 536 (1986). Therefore, even if appellate counsel declines to raise weak issues, he will likely remain above an objective standard of competence and will have caused no prejudice. *Id.*

The PCR court's finding that Petitioner failed to show he was prejudiced by appellate counsel's performance did not constitute an unreasonable application of *Strickland*. As described below, the issues appellate counsel failed to raise were without merit. Therefore, Petitioner has not met his burden of affirmatively proving that he was prejudiced by appellate counsel's performance.

In Claim 13, Petitioner alleges that the trial court misapplied Arizona's capital-sentencing statute, thus violating Petitioner's right to due process of law under the Fifth and Fourteenth Amendments and his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments. Dkt. 35 at 105.

Arizona's capital sentencing statute provides: "The trier of fact shall impose a sentence of death if . . . there are no mitigating circumstances sufficiently substantial to call for leniency." A.R.S. § 13-703(E). Petitioner argues that the trial court did not properly apply this standard because it found that "one mitigating factor does not provide sufficient weight to offset the aggravating factors." Dkt. 36, Ex. A at 5. According to Petitioner, the court "placed the burden of proof on [him] to prove that the mitigating circumstance outweighed the aggravating circumstances." Dkt. 35 at 105.

Petitioner's argument is unpersuasive. The Supreme Court has held that a state may place the burden of proving that mitigating circumstances outweigh aggravating circumstances on a defendant. *Kansas v. Marsh*, 548 U.S. at 173 (citing *Walton v. Arizona*, 497 U.S. 639 (1990)). Claim 13 is therefore meritless.

In Claim 14, Petitioner alleges that the trial court improperly considered victim-impact questionnaires in violation of the Eighth Amendment. Dkt. 35 at 106. Petitioner refers to a statement provided by Deanne Haas, the victim's daughter, recommending the death sentence. In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the United States Supreme Court held that while a state may permit the admission of victim impact evidence, it is not allowed to present evidence concerning a victim's opinion about the appropriate sentence. Judges are presumed to know and follow the law, *Walton*, 497 U.S. at 653, and in his special verdict, Judge Kiger did not cite the victim's opinion as a reason for imposing the death penalty. Dkt. 36, Ex. A. Petitioner has not rebutted the presumption that Judge Kiger considered only appropriate factors in sentencing Petitioner to death. *See Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997) ("in the absence of any evidence to the contrary, [the Court] must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible"). Claim 14 is without merit.

In Claim 16, Petitioner alleges that the trial court denied his rights under the Fifth, Sixth, and Fourteenth Amendments by forcing him to choose between wearing a leg brace or having courtroom deputies placed so close to him that, according to Petitioner, they infringed on his right to communicate with counsel. Dkt. 35 at 109.

Under clearly-established federal law, the State is precluded from using visible shackles on a defendant before a jury absent special security needs. *See Deck v. Missouri*, 544 U.S. 622 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Illinois v. Allen*, 397 U.S. 337 (1970). Petitioner chose not to wear a leg brace and therefore was not visibly shackled. *See* RT 3/7/97 at 3-5. Nothing in the record demonstrates that deputies were able to overhear or view any confidential communications between Petitioner and his attorneys or that their presence had any effect on Petitioner's ability to communicate with counsel. Claim 16 is meritless.

In Claim 17, Petitioner alleges that the reasonable doubt instruction given by the trial court lowered the State's burden of proof, depriving Petitioner of his right to due process under the Fourteenth Amendment and his right to trial by jury under the Sixth and Fourteenth Amendments. Dkt. 35 at 110. This claim is meritless under *Victor v. Nebraska*, 511 U.S. 1 (1994), and *State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995) (adopting standard instruction consistent with that approved in *Victor*).

In Claim 19, Petitioner alleges that his conviction for armed robbery violated his right to due process pursuant to the Fourteenth Amendment because there was insufficient evidence to support the conviction. Dkt. 35 at 114. In Claim 20, Petitioner contends that because insufficient evidence exists to support the armed robbery conviction, his felony murder conviction violates the due process clause of the Fourteenth Amendment and must be vacated. *Id.* at 20.

A habeas petitioner challenging the sufficiency of the evidence is entitled to relief only "if no rational trier of fact" could have found proof of guilt beyond a reasonable doubt based on the trial evidence. *Jackson*, 443 U.S. at 324. The evidence must be considered "in the light most favorable to the prosecution" and a court may not substitute its judgment for

that of the jury. *Id.* at 319. "[A] federal habeas court faced with a record of historical facts must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

At the time of the time of the murder, robbery was defined as follows:

> A person commits robbery if in the course of taking any property of another from his person or immediate presence and against his will, such person threatens or uses force against any person with intent either to coerce surrender of property or to prevent resistance to such person taking or retaining property.

A.R.S § 13-1902. To commit armed robbery the defendant must have been armed with or threatened the use of a deadly weapon. A.R.S. § 13-1904. From the evidence presented at trial, namely Kester's testimony, a rational juror could find beyond a reasonable doubt that Petitioner used force to prevent resistance when he shot Haas to death and took his property. Claim 19 is meritless.

Claim 20 is meritless because sufficient evidence supported the underlying armed robbery conviction and because the jury also convicted Petitioner of premeditated first-degree murder.

In Claim 26, Petitioner alleges that his sentences for the non-capital offenses were aggravated in violation of his Sixth Amendment right to trial by jury. Dkt. 35 at 124. As described above in the Court's analysis of Claim 11, this claim is meritless because neither *Apprendi* nor *Blakely v. Washington*, 542 U.S. 296 (2004), applies retroactively. *See Cooper-Smith*, 397 F.3d at 1246.

Conclusion

Because the claims appellate counsel failed to raise are without merit, Petitioner cannot show a reasonable probability that he would have prevailed on appeal if they had been raised. Therefore, he has failed to show that he was prejudiced by appellate counsel's performance and he is not entitled to relief on Claim 22.

**Claim 23**

Petitioner asserts that "[g]iven the procedures for post-conviction review in Arizona

capital cases, [he] is constitutionally entitled to the effective representation of post-conviction counsel." Dkt. 35 at 121. Petitioner specifically alleges that he was denied the effective assistance of post-conviction counsel and his right to due process because of an unresolved conflict between himself and counsel. *Id.*

There is no constitutional right to counsel in state post-conviction proceedings. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 7-12 (1989); *Bonin v. Vasquez*, 999 F.2d 425, 429-30 (9th Cir. 1993). Therefore, ineffective assistance of PCR counsel is not a cognizable habeas claim. *See* 28 U.S.C. § 2254(I) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Claim 23 is denied.

**Claim 25**

Petitioner alleges that his convictions were obtained in violation of his right to a fair trial and to due process of law under the Fifth, Sixth, Eighth, and Fourteenth Amendments because Lisa Kester's plea agreement contained an unenforceable "consistency" provision. Dkt. 35 at 131. Respondents concede that the claim is exhausted. Dkt. 36 at 91.

As Petitioner's trial approached, Kester entered into a plea agreement with the State. The agreement required Kester to verify "that all prior statements made to [Yavapai County Detectives] Danny Martin and Roger Williamson were truthful." Appellee's Answering Br., Ex. A at 2. It also required Kester to "appear at any proceeding including trial upon the request of the State and testify truthfully to all questions asked" and to "cooperate completely with the State of Arizona in the prosecution of" Petitioner. *Id.* at 2-3. The State was allowed to dishonor the agreement if Kester violated any of its terms. *Id.* at 3.

The Arizona Supreme Court rejected Petitioner's claim that the plea agreement contained a consistency provision in violation of his due process rights. *Kayer*, 194 Ariz. at 430-31, 984 P.2d at 38-39. Because Petitioner did not object to the agreement at trial, and in fact used the agreement to attack Kester's credibility, the court reviewed the claim only for fundamental error and found none. *Id.* The court did not reach a conclusion as to

whether the agreement actually contained a consistency provision. *Id.* at 431 n.1, 984 P.2d at 39.

Even if the plea agreement had contained a consistency provision, Petitioner would not be entitled to relief on this claim. Petitioner has not cited, nor has the Court identified, any Supreme Court authority addressing the due process implications of consistency agreements.[16] As the Ninth Circuit observed in *Cook v. Schriro*, "there is no Supreme Court case law establishing that consistency clauses violate due process or any other constitutional provision." 538 F.3d 1000, 1017 (9th Cir. 2008). The Ninth Circuit concluded that, "[b]ecause it is an open question in the Supreme Court's jurisprudence, we cannot say 'that the state court unreasonably applied clearly established Federal law'" by rejecting Petitioner's claim. *Id.* (quoting *Musladin*, 549 U.S. at 77) (internal quotations omitted). Claim 25 is denied.

## EVIDENTIARY DEVELOPMENT

Petitioner requests an evidentiary hearing or other forms of evidentiary development with respect to Claims 9, 15, 16, 22, and 23. Dkt. 46. Pursuant to *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254(e)(2), a federal district court must hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing" at trial or in a collateral proceeding.

---

[16] The federal appellate courts do not appear to have addressed the issue directly, although they have consistently held that "[a]n agreement that requires a witness to testify truthfully in exchange for a plea is proper so long as 'the jury is informed of the exact nature of the agreement, defense counsel is permitted to cross-examine the accomplice about the agreement, and the jury is instructed to weigh the accomplice's testimony with care.'" *Allen v. Woodford,* 395 F.3d 979, 995 (9th Cir. 2005) (quoting *United States v. Yarbrough,* 852 F.2d 1522, 1537 (9th Cir. 1988)). Nor is Petitioner's claim supported by state law. In *State v. Rivera,* 210 Ariz. 188, 191, 109 P.3d 83, 86 (2005), the Arizona Supreme Court held that the co-defendants' plea agreements, which required truthful testimony and avowals that prior statements were true, were not impermissible "consistency agreements."

*See Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228, 1233-34 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations); *see also Landrigan*, 550 U.S. at 474 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate."). Based on these principles, Petitioner is not entitled to an evidentiary hearing or further evidentiary development.

With respect to Claim 9, because there is no Supreme Court precedent holding that lethal injection violates the Constitution, Petitioner cannot gain habeas relief under the AEDPA and is not entitled to evidentiary development.

As explained above, Claim 15 is procedurally barred.

With respect to Claim 16, alleging violations arising from the courtroom security arrangements, Petitioner has neither identified any disputed facts nor "allege[d] facts which, if proved, would entitle him to relief." *Townsend,* 372 U.S. at 312-13. Therefore, he is not entitled to an evidentiary hearing.

With respect to Claim 22, Petitioner's allegations of ineffective assistance of appellate counsel are properly resolved on the record. *See Gray v. Greer,* 800 F.2d 644, 647 (7th Cir.1985) ("it is the exceptional case" where a claim ineffective assistance of appellate counsel "could not be resolved on the record alone"). Moreover, Petitioner has not identified any disputed facts or alleged facts that would entitle him to relief.

Claim 23, alleging ineffective assistance of PCR counsel, is not cognizable.

## CONCLUSION

For the reasons set forth above, Petitioner has failed to show that he is entitled to habeas relief on any of his claims, and additional evidentiary development is neither required nor warranted.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of

conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability ("COA") to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court finds that reasonable jurists could debate its resolution of Claims 1(B)(4) and 2. For the reasons stated in this order, the Court declines to issue a COA with respect to any other claims.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus, Dkt. 35, is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that Petitioner's motion for evidentiary development, Dkt. 46, is **DENIED**.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on November 5, 2007, Dkt. 5, is **VACATED.**

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

> Whether Claim 1(B)(4) of the Amended Petition – alleging ineffective assistance of counsel at sentencing – is without merit.

Whether Claim 2 of the Amended Petition – alleging that Petitioner's rights were violated when the trial court accepted his waiver of a continuance at sentencing – is without merit.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 19th day of October, 2009.

_David G. Campbell_
David G. Campbell
United States District Judge